**UNITED STATES of America,**
**Appellee,**

**v.**

**Scott BRADLEY, Appellant.**

**UNITED STATES of America,**
**Appellee,**

**v.**

**Charles M. MANN, Appellant.**

**UNITED STATES of America,**
**Appellee,**

**v.**

**George A. ROSE, Appellant.**

**Nos. 13574–13576.**

United States Court of Appeals
Fourth Circuit.

Argued Oct. 10, 1969.

Decided Nov. 28, 1969.

Charles F. Lambeth, Jr., Thomasville, N. C. (Norman B. Smith, Greensboro, N. C., on the brief) for appellants.

J. C. Proctor and Richard A. Marchetti, Asst. U. S. Attys. (Robert H. Cowen, U. S. Atty., on the brief) for appellee.

Before SOBELOFF, BOREMAN and BUTZNER, Circuit Judges.

SOBELOFF, Circuit Judge:

On November 16, 1968, the three appellants went to Fort Bragg in the company of nine fellow-students of the University of North Carolina with the intention of distributing leaflets.[1] Upon arrival at the Fort they consulted with an officer in the Provost Marshal's office and showed him their leaflets. In return, the officer showed them what he believed to be the applicable regulation and warned them that their proposed action would be met with arrest.

Confronted with official resistance to their purpose, the students left the base and after discussion all but Charles Mann and George Rose decided to abandon the plan. These two persisted in their design and after dinner they returned to Fort Bragg to distribute the leaflets. This now diminished corps of leafleteers was accompanied by the other students who intended not to participate but to observe. Upon their arrival, Mann and Rose took up places on the steps and sidewalk of a theater and began handing out their pamphlets. All the other students, except one, a reporter for a campus newspaper, remained nearby in their two parked automobiles. The entire activity was peaceful and the rec-

ord affords no intimation of any disruption as a result of the handbilling. Nevertheless, after about a half hour the military police appeared and arrested all of the students, twelve in number.

Those involved in this appeal are Mann and Rose, the principals, and Scott Bradley, who drove one of the cars. The three were convicted by a United States Commissioner on November 25, 1968 of violating 18 U.S.C. § 1382, which punishes presence on a military post "for any purpose prohibited by law or lawful regulation." The District Court upheld the judgments.

Appellants level a two-pronged attack on their convictions. They contend that, properly construed, the regulation invoked does not apply to their actions. But even if it does, appellants maintain that their activity, carried out in a completely open and unrestricted portion of the base, was protected by the First Amendment.[2] Since we agree with their first argument, we find it unnecessary to decide constitutional questions raised by appellants.

The regulation which is the core of the controversy is Fort Bragg Regulation No. 210-22 [the Regulation]. It provides:

"On-Post Demonstrations

1. *Purpose.* The purpose of this directive is to establish policies for the control of demonstrations and civilian activities on this post.

2. *General Policy.*

a.) Picketing, demonstrations, sit-ins, protest marches, political speeches, and similar activities are prohibited and will not be conducted on this post except as provided in this paragraph.

b.) The installation commander may grant exceptions to the policy contained in this paragraph. Applica-

---

1. There were two kinds of leaflets. One attacked the war in Vietnam and defended those that oppose it as the real supporters of the soldiers. The other invoked the right of free speech for soldiers and assailed alleged attempts to suppress it.

2. Appellants also contend that the regulation is void for vagueness and that applying it in this instance, without military justification, is a denial of equal protection of the laws.

tions for exceptions shall be submitted in writing to the Provost Marshal, this headquarter, at least seven days prior to the date of the proposed demonstration or other activity.

3. No one shall enter or remain on this post for any of the purposes prohibited by this regulation. * * * "

Obviously, the Regulation does not in terms prohibit handbilling. The issue this appeal presents is whether, notwithstanding that omission, appellant's activity was within the Regulation's proscription. Four of the five specifications of activity in the Regulation are obviously inapplicable to the appellants' conduct. By no stretch can what they did fall within the categories of picketing, sit-ins, protest marches or political speeches. If appellants' action is within the Regulation's ban, it must be either as a demonstration or as activity similar to the explicitly designated conduct. Ultimately then, whether the students' deed is contemplated by the Regulation depends on how closely it approximates the enumerated "picketing, demonstrations, sit-ins, protest marches, political speeches."

If there is any feature common to all the listed acts, it is that the expression they embody is not merely offered to the public, but overtly displayed and proclaimed. They are "demonstrative" activities. Such acts as picketing, sit-ins, protest marches, speeches and acts ordinarily associated with demonstrations, like parading, singing, and display of placards, all, as appellants aptly put it, "inevitably intrude upon the senses of those within earshot or eyesight." The casual passerby cannot ignore the event—he must notice it and cannot escape exposure to its message.

Other modes of expression are much less conspicuous and insistent in their impact. The pure dissemination of information, unaccompanied by fanfare, is qualitatively different. Distribution of newspapers, for example, contrasts with the prohibited conduct in that the consumer may choose whether or not to avail himself of the proffer. Similarly, the person to whom a pamphlet is tendered may decide not to accept it. These activities are less intrusive and substantially different in kind from those enumerated in the Regulation.

That a base commander, in formulating his Regulation, should have chosen to prohibit one mode of expression but not the other is not surprising. The distinction might easily occur to an officer who feels the need to curb certain disruptions, and even distractions on his post, but would refrain from prohibiting all forms of speech.[3] Nor is the dichotomy novel. Congress in its 1959 amendments to the National Labor Relations Act prohibited certain kinds of picketing, but left handbilling untouched. The then Senator John F. Kennedy, a Senate conferee, stated,

> We were not able to persuade the House conferees to permit picketing in front of that secondary shop, but were able to persuade them to agree that the union shall be free to conduct informational activity short of picketing. In other words, the union can hand out handbills at the shop * * and can carry on all publicity short of having ambulatory picketing.

Quoted in NLRB v. Fruit & Vegetable Packers & Warehousemen, 377 U.S. 58, 70, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964). In addition, the Supreme Court has, on occasion, utilized the difference between

---

3. Since the date of the Fort Bragg incident the Department of the Army has seemingly invited commanding officers to promulgate regulations broader than the one in force in November, 1968. New Regulation AR 210–10, ¶ 5–5(e) provides:

An installation commander may, in his discretion, impose a requirement that distribution of publications may not be made except through regularly es-

tablished and approved distribution outlets, unless prior approval is obtained from the commander or his authorized representative.

We have no occasion in this case to express any view in respect to the validity or invalidity of the above provision or any regulation which may be fashioned under it.

amplified sound and quiet handbilling to justify different degrees of First Amendment protection for the two activities. Compare Kovacs v. Cooper, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949) (ordinance prohibiting sound trucks upheld) with Martin v. Struthers, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943) (ordinance prohibiting door-to-door handbilling voided).

■ Fortifying our interpretation is the venerable principle that a provision should be construed, if possible, to avoid doubts about its constitutionality.[4] Should we accept the more expansive interpretation urged by the prosecution, we would confront substantial constitutional issues. Without reaching the merits, we recognize that at the very least, appellants' constitutional arguments are far from frivolous.

This construction does not mean that handbilling, under every conceivable circumstance would be so dissimilar from the conduct delineated in the Regulation as to be exempt. Everything depends on the demeanor that characterizes the enterprise. If it is mere dissemination of information, done in an unobtrusive and non-disruptive manner, then the Regulation does not reach it. On the other hand, if done with less circumspection, it may approach what the Regulation condemns.[5] For example, if the operation were predominantly a mass demonstration, we would have a different case.

■ In the present case numerous people were not milling about. Only two of the students passed out leaflets; and they did so with decorum. There is no indication that their behavior promoted disruption, confusion or inconvenience. Suffice it to say that on this record we perceive no violation of the Regulation.[6]

Reversed with directions to enter judgment of acquittal.

4. Chief Justice Taft said, "[i]t is our duty in the interpretation of federal statutes to reach a conclusion which will avoid serious doubt of their constitutionality." Richmond Screw Anchor Co. v. United States, 275 U.S. 331, 346, 48 S.Ct. 194, 198, 72 L.Ed. 303 (1928). There have been similar expressions by Mr. Justice Stone [later Chief Justice] in Lucas v. Alexander, 279 U.S. 573, 577, 49 S.Ct. 426, 73 L.Ed. 851 (1929) ; Chief Justice Hughes in Crowell v. Benson, 285 U.S. 22, 23, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932) ; Mr. Justice Frankfurter in United States v. Rumely, 345 U.S. 41, 45, 73 S.Ct. 543, 97 L.Ed. 770 (1953) ; Mr. Justice Brennan in United States v. Raines, 362 U.S. 17, 22, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960) ; and Mr. Justice Clark in United States v. National Dairy Products Corp., 372 U.S. 29, 32, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963).

5. In a non-military case involving picketing, the Supreme Court upheld a First Amendment claim by analogizing the picketing to handbilling. In doing so, the Court noted that conduct cannot be judged by its title; and activity usually less obtrusive than another can be the more offensive given a different context. Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc., 391 U.S. 308, 315–316, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968).

6. In one sense the Government's position may be said to support our construction of the Regulation. The prosecution has strenuously defended its own interpretation, but in support of the constitutionality of the prohibition, has highlighted the content of the pamphlets themselves, while hardly touching on the nature of the appellants' behavior.

The new Army Department Regulation AR 210–10, ¶ 5–5 explicitly authorizes a commander to restrict dissemination of publications which appear to be a "clear danger to military loyalty, discipline, or morale." Again we do not pass on the validity of this provision. But, contrasting this directive with the Fort Bragg Regulation, it seems clear that the latter was not designed for the same type of control. Rather its concern is with the conduct of individuals and not with ideas.

By not seriously quarreling with our characterization of the appellants' conduct and by placing major emphasis on the content of the publication, the Government lends credence to the idea that it, as well, does not think that the activity, taken by itself, is particularly offensive.