**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**John Thomas FLOWER, Defendant-Appellant.**

**No. 31143.**

United States Court of Appeals, Fifth Circuit.

Nov. 8, 1971.

Rehearing and Rehearing En Banc Denied Jan. 13, 1972.

Simpson, Circuit Judge, filed dissenting opinion.

Simpson, Goldberg, and Godbold, Circuit Judges, dissented from the denial of rehearing en banc.

Maury Maverick, Jr., Texas Civil Liberties Union, San Antonio, Tex., for defendant-appellant.

James W. Kerr, Jr., Asst. U. S. Atty., Seagal V. Wheatley, U. S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before COLEMAN, SIMPSON, and RONEY, Circuit Judges.

COLEMAN, Circuit Judge:

On or about October 25, 1969, the appellant, John Thomas Flower, Peace Education Secretary of the American Friends Service Committee for Texas, Oklahoma, and Arkansas, received a properly prepared and executed order of debarment (Appendix "A") from the Deputy Commander of Fort Sam Houston located in San Antonio, Texas. In the order Flower was told that his re-entry upon said reservation would result in his arrest and prosecution under the provisions of 18 U.S.C., § 1382 (Appendix

"B"). This order was issued because information had been received at headquarters that on or about October 22, 1969, the appellant had participated in an attempt to distribute an unauthorized publication contrary to Fort Sam Houston Regulation 210–6 dated June 12, 1969 (Appendix "C"). This regulation governed the distribution and dissemination of publications on Fort Sam Houston and was promulgated under the authority of Army Regulation 210–10 issued by the Secretary of the Army pursuant to 10 U.S.C. § 3012(b) (1) (Appendix "D").

On December 11, 1969, the appellant re-entered Fort Sam Houston in defiance of the order dated October 24, 1969. At the time of his arrest he was in the vicinity of the post library distributing leaflets advertising a "Town Meeting on the Vietnam War" which was to be held at Trinity University.

He was charged with the violation of 18 U.S.C., § 1382 and adjudged guilty of the same in the United States District Court for the Western District of Texas. Flower appeals from the decision of that Court and asks that both Fort Sam Houston Regulation 210–6 and 18 U.S.C., § 1382 be declared unconstitutional because they violate the First and Fifth Amendments. He, in short, claims that both his re-entry and prior conduct of October 22, 1969, are protected by the First Amendment and that both the statute and regulation are constitutionally defective in light of the First and Fifth Amendments.

Under the explicit authority of the regulation and in light of the historically unquestioned power of a commanding officer to summarily exclude civilians from the area of his command, there can remain no serious doubt of his authority to do so. Such summary exclusion has also been held not to violate the due process clause of the Fifth Amendment. Cafeteria and Restaurant Workers, etc. v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961); United States v. Jelinski, 5 Cir., 1969, 411 F.2d 476; Government of Canal Zone v. Brooks, 5 Cir., 1970, 427 F.2d 346.

However, as stated, appellant claims that his re-entry and conduct in violation of Fort Sam Houston Regulation 210–6 previous to his re-entry are protected by the First Amendment. The violation of this regulation was the basis of the debarment order of October 24, 1969. For his conduct to be immune from prosecution either the statute or the regulation must be declared unconstitutional.

To acquiesce in appellant's claim that both the statute and the regulation are unconstitutional we would have to accept his contention that there is no difference between public streets, public roads, towns, shopping centers, and public parks on one hand and military reservations under the exclusive jurisdiction of the federal government on the other. We would have to agree all are one and the same and that the exercise of First Amendment rights at all of these places is governed by the same standards. This we cannot do.

From the decisions which have construed the First Amendment certain principles clearly emerge.

The rights of free speech and assembly are fundamental in our democratic society but they do not mean that everyone who has opinions or beliefs to express may, at his option only, address a group at any public place, at any time. Even where municipal or state property is open to the public generally, the exercise of First Amendment rights may be regulated so as to prevent interference with the use to which the property is ordinarily put, Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1964); Cox v. Louisiana, 379 U.S. 559, 85 S.Ct. 466, 476, 13 L.Ed.2d 487 (1964); Cameron v. Johnson, 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1967).

The Supreme Court in Adderley v. Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966), held that the arrest of 107 demonstrators on county jail premises did not violate their First Amendment rights. Mr. Justice Black, writing for the majority, stated that "The state, no less than a private owner

of property, has power to preserve the property under its control for the use to which it is lawfully dedicated". (At page 47, 87 S.Ct. at page 247). He also said that the concept of constitutional law which says that people who want to exercise First Amendment rights have a constitutional right to do so whenever, however, and wherever they please had been rejected in Cox v. Louisiana, *supra,* and was again being rejected. Furthermore, it was stated that the United States Constitution does not forbid a state to control the use of its own property for its own lawful nondiscriminatory purposes. Quite obviously, this would apply to the federal government and to its military installations.

Fort Sam Houston was lawfully dedicated and designed to be used as a training base for the preparation of soldiers of the United States. The regulations which were promulgated by the commanding officer of Fort Sam Houston were designed to insure that the use for which the reservation had been dedicated and designed could and would be maintained. At entrances, signs disclosed the nature and name of the installation. The area is an important part of the armed forces of our Country. Soldiers based there continually undergo training, and participate in programs supporting the national defense of the United States.

To say that a military base is like the company town in Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1945), a city as in Shuttlesworth v. Birmingham, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1968), a shopping center as in Amalgamated Food Employees Local 590 v. Logan Valley Plaza, Inc., 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1967), state capitol grounds as in Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1962), a bus terminal in Wolin v. Port of New York Authority, 2 Cir., 1968, 392 F.2d 83, or the World's Fair Grounds as in Farmer v. Moses, 232 F.Supp. 154 (S.D., New York, 1964) would ignore the indisputable fact that military bases do not extend a general and open invitation to the public to use their facilities. A military base simply cannot be said to be dedicated to *general use by the public at large.*

Traditionally, towns, shopping centers, parks, and the like, have been open to the public. Historically, they are associated with the right of assembly and opportunities for the communication of thought which are common to public questions. There is no room for an argument that military bases have existed in like fashion.

To argue that Fort Sam Houston is "open" to the public is to disregard the fact that all forms of activity by civilians on a military base are permitted as a matter of license and never as a matter of right. Civilians who work, or visit, or enter there do so because of a privilege afforded them by the United States Army. That privilege, like any other grant, is subject to revocation or denial. It has long been recognized that military personnel, and others who enter upon a military reservation, surrender some of their individual rights so that military discipline and security may remain inviolate, United States v. Miller, 261 F. Supp. 442 (D.Del., 1966).

Admitting that a military reservation has some aspects of public property it is also true, as Justice White said in his dissent in *Amalgamated Food Employees,* supra, that "some property is available for some uses and not for others; some public property is neither designed nor dedicated for use by pickets or for other communicative activities". (391 U.S. at page 338, 88 S.Ct. at page 1619). This would certainly seem to be the import of the *Cox, Adderley,* and *Cameron* cases.

Appellant's contention that his reentry was constitutionally protected is based primarily on three cases. In United States v. Bradley, 4 Cir., 1969, 418 F.2d 688, two students, who had been arrested while distributing leaflets on Fort Bragg, were convicted of violating 18 U.S.C., § 1382 because their presence was seemingly prohibited by a lawful post regulation. The Post Regulation

27-1, which they were accused of violating, prohibited picketing, demonstrations, sit-ins, protest marches and political speeches but made no reference to prohibiting handbilling. Their conviction was reversed because the applicable regulation did not prohibit the activities which were the basis for the prosecution. Here, appellant's re-entry onto Fort Sam Houston was prohibited by an appropriate order of debarment. Furthermore, there can be no question that Post Regulation 210-6 prohibited appellant's unauthorized distribution of literature on October 22, 1969 and on December 11, 1969.

Appellant also relies on Kiiskila v. Nichols, 7 Cir., 1970, 433 F.2d 745. Carolyn Kiiskila, a civilian employee of a credit union of Fort Sheridan, was excluded from the base because she had distributed anti-war literature near a naval base. In holding her exclusion unconstitutional, because it denied her the freedom of speech and association, the court emphasized that Kiiskila had not violated an applicable post regulation and also noted that she had not distributed literature on Fort Sheridan. The court said that "never in the past has plaintiff distributed literature on Fort Sheridan or any other military base and the record is devoid of statements by Kiiskila or others in the Veterans for Peace indicating an intent to do so in the future". It thus appears that the court may have reached a different result if Kiiskila had been arrested for distributing literature on base in violation of an applicable post regulation. Appellant's reliance on this case is therefore of no help to his contentions.

Appellant also cites United States v. Watson, 80 F.Supp. 649 (E.D., Va., 1948), as support for his contention that although Fort Sam Houston had been conveyed to the United States government for military purposes, the inference that the taking for such purposes dissolved all the right of users theretofore held by the public or by persons having a special interest therein was not justified. In *Watson* the defendant was found guilty of recklessly driving an automobile on a road on Quantico Marine Corps Reservation which was the only thoroughfare connecting the town of Quantico with the remainder of the state of Virginia. However, he was found not guilty of violating 18 U.S.C., § 1382, re-entering a military reservation after being warned not to do so. It is important to note that this highway existed before the taking by the government and that in *Watson* the defendant was forced *by necessity* to use the highway in order to go to and from Quantico. Appellant Flower shows us no such similar need for his activities on the base.

There is no similar showing, as there was in *Watson*, that the United States acquired the land subject to any rights of the appellant or that anything but exclusive use was contemplated by the parties when the land was conveyed. In the deed of conveyance there is no mention of "other public uses". Exclusive jurisdiction is ceded to the United States over the particular tract of land "to hold, use, occupy, own, possess, and exercise said jurisdiction over the same as long as the same remains the property of the United States. * * *"

■ That appellant's re-entry was not protected by the First Amendment is supported by Holdridge v. United States, 8 Cir., 1960, 282 F.2d 302. In Holdridge three young men were convicted of violating 18 U.S.C., § 1382 because they had re-entered Mead Ordnance Depot after having been removed therefrom and ordered not to re-enter. The Court of Appeals, Blackmun, Circuit Judge, affirmed the conviction and held that the prosecution of the defendants for violating the statute prohibiting re-entry onto the military reservation (after having been removed therefrom and ordered not to re-enter) did not violate guarantees of freedom of religion, speech and assembly, notwithstanding that their re-entries were motivated by religious beliefs with respect to the immorality of war. Judge Blackmun stated:

"The defense suggests the Constitution's guarantees of freedom of re-

ligion, speech and assembly. While these are fundamental rights, it is well settled that they are not absolute in all their aspects. * * * Moreover, the doing of an act motivated by religious belief or thought to be a proper exercise of free speech does not necessarily preclude criminal liability." * * * (282 F.2d at 311).

■ Flower's attempted analogy between various public places and a military base is not in step with reality. As has been repeatedly stated, the First Amendment is not an absolute. When First Amendment freedoms are sought to be regulated we must weigh the circumstances and appraise the reasons in support of such regulations. Schneider v. State, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939). We hold that both the circumstances and the reasons in support of the regulation at Fort Sam Houston pass Constitutional muster.

■ To manage the internal operation of an important part of the national military establishment, and in its proprietary military capacity, the federal government, throughout history, has exercised unfettered control over areas dedicated to military purposes. Military regulations must be considered in the light of military necessity, must be geared to meet important and imperative needs of mobilization and national vigilance. There is no time for litigious interruption. Therefore, wide discretion exists in the executive department in both the formation and the application of necessary regulations as well as in their interpretation as what constitutes "for the good of the service". Noyd v. McNamara, 10 Cir., 1967, 378 F.2d 538.

Stationed at Fort Sam Houston are units continually and continuously undergoing training and participating in programs for the national defense. The installation commander has a duty to maintain order and discipline among his personnel. In pursuance of this duty he would be expected to monitor the literature available to military personnel on the base. He must be aware of the contents of materials which are to be dis-

tributed outside of regularly established and approved channels and to determine if such materials interfere with the purposes of the reservation. Fort Sam Houston Regulation 210–6 is, we think, a highly reasonable method of maintaining discipline and morale on the base. It is a justifiable means of accomplishing these purposes.

■ Appellant claims that the statute and regulation constitute a prior restraint on speech in violation of the First Amendment. Prior restraint is not per se unconstitutional *under all circumstances*. Freedman v. Maryland, 380 U. S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1946); Times Film Corp. v. City of Chicago, 365 U.S. 43, 81 S.Ct. 391, 5 L.Ed.2d 403 (1960). The prior permission requirement here in issue is necessary in order to allow the installation commander to carry out his assigned duty and is not unreasonable in that regard. Moreover, the on base distribution of materials through unauthorized distribution outlets could wrongfully imply that their contents had been approved and were an expression of Army policy.

■ For reasons stated in preceding paragraphs, and at the same time realizing the purpose of a military installation and the function of a base commander, we hold that this case established no unjustifiable prior restraint in violation of the First Amendment. We detect only a reasonable regulation promulgated in pursuance of an essential objective. It must be remembered that the capacity for, or extent of, evil may justify a prior restraint on First Amendment rights. Times Film Corp. v. City of Chicago, *supra.*

■ Appellant charges that the regulation and the statute are vague and uncertain, contravening the due process clause of the Fifth Amendment. Appellant refuses to acknowledge the basic nature of a military installation and the function of a base commander. The power of a military commandant over the reservation he commands, although not that of a czar or a dictator, is necessarily

extensive. This regulation places much discretion in the base commander, but who in a military situation could better determine what is necessary for the discipline, loyalty, the morale of the military personnel on the base, the maintenance of the military mission and the safeguarding of military personnel?

Appellant points to Shuttlesworth v. Birmingham, *supra*, which held that a Birmingham parade ordinance which gave the City Commission extensive authority to issue parade permits on the basis of broad criteria entirely unrelated to the legitimate regulation of the public streets and sidewalks was unconstitutional on its face because of its overbreadth and vagueness. Birmingham is not Fort Sam Houston. The criteria which govern the base commander's decision are entirely related to the legitimate regulation and function of an army base.

The terms of the regulation are clear. It plainly points out that one seeking to distribute materials on base must first seek approval before doing so. The punishment given to those who disobey the regulation is also clearly set out.

Neither is there anything vague or uncertain about 18 U.S.C., § 1382. It points out that one who is ordered not to re-enter a military reservation and is found there after re-entry may be arrested and imprisoned. It is aimed at conduct of a limited kind. There is no lack of notice in the statute, nothing to trap or to fool the unwary. In its terms it is clear and concise.. Appellant does not deny that he had notice of the statute. Yet, he chose to disobey it.

The record does not show that the regulation in question has been administered otherwise than in a fair and non-discriminatory manner. All who wish to distribute publications on Fort Sam Houston through other than regularly established and approved channels must go through the same procedure set out in Post Regulation 210–6. There has been no showing that any person submitting materials for approval has been unwarrantedly discriminated against. There has been no showing of any arbitrary and discriminatory denials of requests. Therefore, in view of these facts, we cannot say that there has been a denial of equal protection of the law.

We do not infer that the commander has unfettered discretion under this regulation. We hold only that within certain limits, the military establishment has authority to restrict the distribution of printed materials. This right to restrict distribution must be kept within reasonable bounds and courts may determine whether there is a reasonable basis for the restriction, Dash v. Commanding General, Fort Jackson, South Carolina, 307 F.Supp. 849 (D., S.C. 1969), affirmed 4 Cir., 1970, 429 F. 2d 427, certiorari denied 401 U.S. 981, 91 S.Ct. 1192, 28 L.Ed.2d 333 (1970). Whether the Post Commander acts arbitrarily or capriciously, without proper justification, is a question which the courts are always open to decide. Flower invoked not the aid of the courts but resorted to the defiance of self help at his own whim and caprice.

In summary, by its very nature, function, and purpose, a military reservation must be distinguished from a normal public community and its adjuncts. It has peculiar needs and its regulations must be fitted to meet those needs. We find that the regulation and the statute here in issue are reasonably adapted to meet those needs. They trample on no constitutionally protected right. This case presents a situation, recognized in other cases, where the unfettered exercise of First Amendment rights would be inconsistent with the necessary purposes of the federally owned property in question. The Government has the right to preserve its military property for the uses to which that property is lawfully dedicated. The Constitution does not require us to hold otherwise.

The judgment of the District Court is

Affirmed.

APPENDIX "A"

DEFENDANT'S EXHIBIT D

(EMBLEM)

DEPARTMENT OF THE ARMY
Headquarters Fort Sam Houston
Fort Sam Houston, Texas 78234

24 OCT. 1969

AKPSH–PM

SUBJECT: Prohibition from Entering the Fort Sam Houston Military Reservation

John Thomas Flower
126 Brees Boulevard
San Antonio, Texas 78201

1. Title 18, Section 1382, United States Code, provides as follows:

"Whoever, within the jurisdiction of the United States, goes upon any military, naval, or Coast Guard reservation, post, fort, arsenal, yard, station, or installation, for any purpose prohibited by law or lawful regulation; or Whoever reenters or is found within any such reservation, post, fort, arsenal, yard, station, or installation, after having been removed therefrom or ordered not to reenter by any officer or person in command or charge thereof—Shall be fined not more than $500 or imprisoned not more than six months, or both." (June 25, 1948, ch. 645, Sec. 1, 62 Stat. 765)

2. Information received at this headquarters indicates that on or about 22 October 1969, you participated in a plan by a member of the United States Army to enter the Military Reservation of Fort Sam Houston, Texas, and distribute an unauthorized publication contrary to a lawful Fort Sam Houston's Regulation, and that you did subsequent thereto enter the Military Reservation of Fort Sam Houston, Texas, and by your presence encouraged and supported the unlawful distribution as previously planned.

3. You are hereby prohibited from entering the Military Reservation of Fort Sam Houston, Texas, and any land under the jurisdiction of Fort Sam Houston. You are hereby notified of this prohibition and warned that re-entry upon said reservation will result in arrest and prosecution under the provisions of the foregoing Federal Statute.

FOR THE COMMANDER:

(Signed) MORRIS B. MONTGOMERY
MORRIS B. MONTGOMERY
COL, INF
Deputy Commander

APPENDIX "B"

TITLE 18.—CRIMES AND CRIMINAL PROCEDURE

§ 1382. Entering military, naval, or Coast Guard property.

Whoever, within the jurisdiction of the United States, goes upon any military, naval, or Coast Guard reservation, post, fort, arsenal, yard, station, or installation, for any purpose prohibited by law or lawful regulation; or

Whoever reenters or is found within any such reservation, post, fort, arsenal, yard, station, or installation, after having been removed therefrom or ordered not to reenter by any officer or person in command or charge thereof—

Shall be fined not more than $500 or imprisoned not more than six months, or both.

APPENDIX "C"

HEADQUARTERS, FORT SAM HOUSTON

Fort Sam Houston, Texas 78234
FSH Regulation          12 June 1969
No. 210–6

INSTALLATIONS

Distribution and Dissemination of Publications on Fort Sam Houston

1. *Purpose.* This regulation prescribes policies and procedures for the distribution and dissemination of publications on the Fort Sam Houston Reservation.

2. *Applicability.* This regulation is applicable to all units and personnel assigned to Headquarters, Fort Sam Houston and any subordinate units.

3. *Distribution Through Other Than Normal Channels.*

a. Distribution on the reservation of publications, including pamphlets, newspapers, magazines, posters, handbills, flyers, and other printed material may not be made except through regularly established and approved distribution outlets, unless prior approval is obtained from the installation commander or his authorized representative.

b. Requests for permission to distribute publications outside of regularly established and approved distribution channels shall be directed to the Commanding General, Headquarters, Fort Sam Houston. Included with the request shall be a copy of the publication to be distributed along with the name and address of the distributor and publisher. The distributor shall also set forth the plan for distribution to include number of copies, identity and number of distributors, area of distribution, hours of distribution, cost to the recipient, if any and frequency of distribution.

c. Requests for permission shall be forwarded to the installation commander no later than ten days prior to the proposed distribution.

d. Approval to distribute on post will not be granted where (1) distribution would be accomplished in a manner which would prevent or materially interfere with the accomplishment of the military mission; (2) the publication is obscene or pornographic; or (3) the publication or distribution thereof is unlawful (e. g., UCMJ, 18 U.S.C. §§ 596, 1381, 2386, 2387, 2388, 2391; 50 U.S.C. App. § 462), or would otherwise constitute a clear danger to military loyalty, discipline, or morale of the military personnel at the installation.

3. Should the commander deny permission to distribute material on post, through other than regularly established distribution channels, the distributor will be immediately notified and informed of the reason for disapproval. The installation commander shall submit to Headquarters Department of the Army (ATTN: CINFO) a report in accordance with para 5–5e, AR 210–10, setting forth the information received from the distributor and the reasons for denial.

4. *Distribution of Material Through Normal Channels.*

a. Distribution of material through regularly established and approved distribution outlets may be made without prior approval of the installation commander.

b. The installation commander may delay distribution through regularly established distribution channels of any publication which presents a clear danger to the loyalty, discipline or morale of the troops at this installation.

c. Concurrently, with imposing a delay as authorized in (b) above, the installation commander shall inform the next major commander and Headquarters, Department of the Army (Chief of Public Information, extension 74200), and request approval to prohibit distribution according to para 5–5d, AR 210–10.

5. *Penalties.*

a. Persons not subject to the Uniform Code of Military Justice who distribute material outside of regularly established distribution channels are subject to removal from the installation and bar from re-entry.

b. Persons subject to the Uniform Code of Military Justice, who violate the provisions of this regulation are subject to punishment under the Uniform Code of Military Justice.

6. *References.*

a. AR 210–10.

(AKPSH–JA)

FOR THE COMMANDER
OFFICIAL
(SEAL)

GRAHAM E. SCHMIDT
Colonel, GS
Chief of Staff

J. W. HARRISON
LTC, AGC
Adjutant General

DISTRIBUTION:
A, B, C, N

APPENDIX "D"

TITLE 10.—ARMED FORCES

§ 3012. Secretary of the Army: powers and duties; delegation by.

\*   \*   \*   \*   \*   \*

(b) The Secretary is responsible for and has the authority necessary to conduct all affairs of the Department of the Army, including—

(1) functions necessary or appropriate for the training, operations, administration, logistical support and maintenance, welfare, preparedness, and effectiveness of the Army, including research and development;

\*   \*   \*   \*   \*   \*

———◆———

THE LEAFLET

THIS FRIDAY DECEMBER 12

—8:00 PM—

THIS FRIDAY DECEMBER 12

SAMS MEMORIAL GYMNASIUM

TRINITY UNIVERSITY

*TOWN MEETING ON THE VIETNAM WAR*

*TOWN MEETING ON THE VIETNAM WAR*

—VIET EXPERTS PRO AND CON—

\* DAVID CARPENTER, U.S. STATE DEPARTMENT—Mr. Carpenter is the Public Affairs Officer for the Bureau of East Asian and Pacific Affairs. He served for several years in the Political Section of the American Embassy in Saigon and has also recently served in Paris, Malta and Monrovia. He is a graduate of Harvard University.

\* RICHARD SANCHEZ, chairman of the Mexican-American Advisory Committee to the Republican Party.

\* JONATHAN MIRSKY, CO-DIRECTOR OF THE EAST ASIAN CENTER AT DARTMOUTH UNIVERSITY—Mr. Mirsky has visited Vietnam in 1959, 1965 and 1967. He has held lengthy interviews with North Viet-namese government officials both in Cambodia and Laos and has three times interviewed the North Vietnamese and N.L.F. delegations in Paris. He holds a Ph. D. in Chinese History and is about to publish a book on Laos.

\* DAVID PLYLAR, a former Air Force officer and now a teacher at Edgewood High School. Mr. Plylar has a Masters Degree in both History and Government.

ALL PRESENT ALSO GET A CHANCE TO STATE THEIR VIEWS

TOWN MEETING—THIS FRIDAY DECEMBER 12

8:00 PM—SAMS GYMNASIUM

TRINITY UNIVERSITY

—sponsored by the trinity university free forum—

SIMPSON, Circuit Judge (dissenting):

On December 11, 1969, John Thomas Flower, 38 years of age, was married and living with his wife and four children in the home he was buying at 126 Brees Boulevard, San Antonio. He had no prior record of felony indictment or conviction, or a conviction for any misdemeanor involving moral turpitude. He was the Peace Secretary for the American Friends Service Committee (an organization closely affiliated with President Nixon's denomination, the Quaker church, but not per se a part of that body) with jurisdiction for the AFS Committee over the states of Texas, Oklahoma and Arkansas. On the date indicated Flower was arrested on Braunfels Avenue, an important arterial street of the city of San Antonio, as he stood on the sidewalk of that street distributing handbills or "flyers".

These handbills gave notice of a meeting to be held on Friday evening, December 12, in Sams Memorial Gymnasium of Trinity University (a Methodist oriented and supported institution of higher learning) sponsored by the Trinity University free forum in San Antonio, at

which speakers were scheduled to debate with respect to the Vietnam war. The speakers listed on the handbill were Mr. David Carpenter, Republican Affairs Officer of the U. S. State Department, Mr. Richard Sanchez, Chairman of the Mexican-American Advisory Committee to the Republican party, Mr. Jonathan Mirsky, co-director of the East Asian Center at Dartmouth University, and David Plylar, a former Air Force officer and a teacher at Edgewood High School, San Antonio, and identified as holding a Master's degree in both history and government. The handbill also indicated that there was to be free discussion, including questions and statements from the floor.[1]

Flower when arrested was on foot, by himself, carrying no picket signs or sound amplifiers, not obstructing anyone and not littering the street. He was not using obscene language or otherwise behaving discourteously. He was simply handing out the described flyer or handbills to passersby, nothing more.

The arrest location was a few yards inside one of the numerous gates to Fort Sam Houston, a permanent U. S. Army installation, in front of the post's Main Library Building which is located on the east side of New Braunfels Avenue. New Braunfels Avenue completely traverses the military post from its intersection with Grayson Street on the south to the northerly post gates at Leanda Avenue. The street and its sidewalks are completely open to the public. There is no sentry post or guard at either entrance or anywhere along the route. Traffic flows through the post on this and other streets 24 hours a day. A traffic count conducted on New Braunfels Avenue on January 22, 1968, by the Director of Transportation of the city of San Antonio, shows a daily (24 hour) vehicular count of 15,110 south of Grayson Street (the place where the street enters the post boundary) and 17,740 vehicles daily north of that point. The street is an important traffic artery used freely by buses, taxi cabs and other public transportation facilities as well as by private vehicles, and its sidewalks are used extensively at all hours of the day by civilians as well as by military personnel. Fort Sam Houston was an open post; the street, New Braunfels Avenue, was a completely open street.

In addition to the thousands of books of all descriptions available to military personnel in the library, the Fort Sam Houston post exchange nearby offers for sale a complete assortment of current magazines and newspapers of all kinds, including magazines such as "Harper's" which has long run articles critical of the Army and of the war in Vietnam. The current issue of "Harper's" on sale on the military post on December 11, 1969, prominently featured on its cover descriptive matter relating to an article highly critical of the Army regarding the My Lai massacre. At many locations on the post, including one on the sidewalk in front of the library adjacent to Flower's position, were self-service racks offering the San Antonio daily papers for sale. These papers, in addition to editorial matter, carried the usual wire service reports.

The factual matters recited above either were established by the proof or by stipulations at Flower's nonjury trial or were the subject of offers to prove, or proffers, by Flower's counsel. It was never disputed by the United States that Fort Sam Houston was a completely open post, with thirty-one entrances through which the general public may enter and leave the post, without challenge from any guard or sentry.

Flower's arrest was for violation of an "Order of Debarment" from the Deputy Commander of Fort Sam Houston issued October 24, 1969, advising him that his re-entry upon the military reservation would result in his arrest and prosecution under the provisions of Title 18, U.S.Code, Section 1382.[2] The stated basis for the prohibition was information that Flower had previously, on October 22, 1969, entered the military reserva-

---

1. The full text of the handbill is reproduced at the end of the majority opinion.

2. The debarment order is Appendix A and the text of Section 1382 is Appendix B to the majority opinion.

tion and distributed unauthorized publications.

Following a trial before the court, at which motions to dismiss and for judgment of acquittal raising constitutional issues (including free speech and due process) were raised and denied, the trial judge sentenced the appellant to the maximum penalty provided by law: six months confinement. The trial judge denied Flower bail in any amount and remanded him to the county jail where he remained for three weeks until a panel of this Court ordered him admitted to bail pending appeal in the amount of $500.00.

Because I feel very strongly that this appeal raises constitutional issues of the gravest import arising under the First Amendment to the United States Constitution, I respectfully dissent from the affirmance of Flower's judgment of conviction accomplished by the majority opinion.

I do not believe that the summary exclusion of Flower by the commanding officer from the military reservation can be justified under the decided cases which apply to closed, as opposed to open, military areas.[3]

The district court rejected Flower's offers of proof regarding the public's free access to Fort Sam Houston as immaterial to this prosecution under Title 18, U.S.C., Section 1382. The majority adopts the district court's view of the relevancy of the public's free and unfettered access to Fort Sam Houston. This shutting out of proof or acknowledgment of the public's use of the post was, in my view, egregious error. The decision was reached below and is affirmed here in complete disregard of the realities present. Discussion of the military's *right to control* is academic and uninstructive when such control has been abandoned.

It is clearly settled that the First Amendment protects the distribution of handbills on public streets against arbitrary restrictions imposed by governmental officials. In Lovell v. City of Griffin, 1938, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949, the Supreme Court held that a city ordinance which prohibited the distribution of circulars, handbooks, advertising, or literature of any kind without a permit violated the First and Fourteenth Amendments to the Constitution. This statement from *Lovell* is particularly relevant here:

"The liberty of the press is not confined to newspapers and periodicals. It necessarily embraces pamphlets and leaflets. These indeed have been historic weapons in the defense of liberty, as the pamphlets of Thomas Paine and others in our own history abundantly attest. The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion. * * * The ordinance cannot be saved because it relates to distribution and not to publication." 303 U.S. at 452, 58 S.Ct. at 669, 82 L.Ed. at 954.

See also Schneider v. State of New Jersey, 1939, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155, and Jamison v. State of Texas, 1943, 318 U.S. 413, 63 S.Ct. 669, 87 L.Ed. 869.

In Marsh v. Alabama, 1946, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265, the Supreme Court reversed the conviction of an individual charged with violating an Alabama statute prohibiting entering or remaining on the premises of another after a warning not to do so. The petitioner in *Marsh* was prosecuted for engaging in the distribution of religious literature on the streets of a town wholly owned by a corporation. After noting that the town was completely accessible to the general public, the Court stated:

"As we have heretofore stated, the town of Chickasaw does not function differently from any other town. The 'business block' serves as the community shopping center and is freely

---

3. Cafeteria and Restaurant Workers, etc. v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961); United States v. Jelinski, 5 Cir. 1969, 411 F.2d 476; Government of Canal Zone v. Brooks, 5 Cir. 1970, 427 F.2d 346.

accessible and open to the people in the area and those passing through. The managers appointed by the corporation cannot curtail the liberty of press and religion of these people consistently with the purposes of the Constitutional guarantees, and a state statute, as the one here involved, which enforces such action by criminally punishing those who attempt to distribute religious literature clearly violates the First and Fourteenth Amendments to the Constitution." 326 U.S. at 507–508, 66 S.Ct. at 279, 90 L.Ed. at 269.

The Court also observed that "the more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it." 326 U.S. at 506, 66 S.Ct. at 278, 90 L.Ed. at 268: See additionally, Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, 1968, 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (state court injunction barring peaceful picketing on shopping center location held violative of First and Fourteenth Amendments).

The leading Supreme Court decision dealing with the power of the military to exclude individuals from military reservations is Cafeteria and Restaurant Workers Union, Local 473, AFL–CIO v. McElroy, supra, footnote 3. That case involved a suit by the union and one of its members against the Secretary of Defense and others seeking to compel the return to the employee of her identification badge so that she could enter the Naval Gun Factory and resume her former employment with a private concessionaire. The Court held that the action of the installation's commander in summarily denying a civilian employee of a private contractor access to the installation for security reasons did not violate the requirements of the Due Process Clause of the Fifth Amendment even though such denial was effected without advising the employee of the specific grounds for her exclusion and without according her a hearing. In an-

alyzing the Court's opinion in *Cafeteria Workers,* its own description of the security aspects surrounding the Naval Gun Factory should be kept in mind:

"The Gun Factory was engaged in designing, producing, and inspecting naval ordnance, including the development of weapons systems of a highly classified nature. Located on property owned by the United States, the installation was under the command of Rear Admiral D. M. Tyree, Superintendent. Access to it was restricted, and guards were posted at all points of entry. Identification badges were issued to persons authorized to enter the premises by the Security Officer, a naval officer subordinate to the Superintendent." 367 U.S. at 887, 81 S. Ct. at 1744–1745, 6 L.Ed.2d at 1231–1232.

Significantly, the Court indicated that the Superintendent was not free to deny access to his post for any reason which he might deem appropriate:

"We may assume that Rachel Brawner could not constitutionally have been excluded from the Gun Factory if the announced grounds for her exclusion had been patently arbitrary or discriminatory—that she could not have been kept out because she was a Democrat or a Methodist." 367 U.S. at 898, 81 S.Ct. at 1750, 6 L.Ed.2d at 1238.

Judge Sobeloff's opinion in United States v. Bradley, 4 Cir. 1969, 418 F.2d 688, reflects an awareness of the constitutional issues presented by a prosecution under Title 18, U.S.C., Section 1382, arising out of handbilling on a military installation:

"Fortifying our interpretation is the venerable principle that a provision should be construed, if possible, to avoid doubts about its constitutionality. Should we accept the more expansive interpretation urged by the prosecution, we would confront substantial constitutional issues. Without reaching the merits, we recognize that at the very least, appellants' constitutional arguments are far from frivolous." 418 F.2d at 691.

See also, Kiiskila v. Nichols, 7 Cir. 1970, 433 F.2d 745 (order excluding civilian employee of military credit union from Fort Sheridan, Illinois, held violative of employee's First Amendment rights). But cf. Weissman v. United States, 10 Cir. 1967, 387 F.2d 271, upholding convictions for violations of Title 18, U.S.C., Section 1382, following disruptive behavior of appellants at on-post courts-martial.

The prior decisions of this Court in the field do not compel a view differing from mine. Jelinski v. United States, 5 Cir. 1969, 411 F.2d 476, cert. denied, 396 U.S. 943, 90 S.Ct. 380, 24 L.Ed.2d 245, was a prosecution for a violation of Title 18, U.S.C., Section 1382, which arose out of the appellant's refusal to abide by a debarment order issued by the commander of Kelly Air Force Base, Texas, after the appellant had committed several acts of misconduct on the installation. We held simply that the base commander was not required to afford notice and a hearing to the appellant before issuing his order. In Government of Canal Zone v. Brooks, 5 Cir. 1970, 427 F.2d 346, we held that a conviction under Title 18, U.S.C., Section 1382 was not improper as a result of a minor deviation from the Army regulation governing the issuance of debarment orders.

On the date of his arrest, Flower was standing on a street which was freely accessible to the general public. The Army, for reasons of its own, having decided to make Fort Sam Houston an "open" base—perhaps because the mission of the base was not highly classified or because it was less costly to admit the general public without restriction—should not be permitted to exercise prior restraint on Flower's exercise of his First Amendment right to distribute leaflets on a public street. The Army's order barring Flower from re-entry to Fort Sam Houston was arbitrary and a clear violation of his constitutional rights. I would not hesitate to reverse this conviction with directions to dismiss the information.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

PER CURIAM:

The Petition for rehearing is denied and the Court having been polled at the request of one of the members of the Court and a majority of the Circuit Judges who are in regular active service not having voted in favor of it, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is also denied.

Before JOHN R. BROWN, Chief Judge, and WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, SIMPSON, MORGAN, CLARK, INGRAHAM and RONEY, Circuit Judges.

SIMPSON, Circuit Judge, dissenting, with whom GOLDBERG and GODBOLD, Circuit Judges, join:

For the reasons stated in my dissent to the original panel decision, I dissent from the refusal of the Court to grant rehearing en banc.