**Michael A. KROLL, Plaintiff,**

v.

**UNITED STATES CAPITOL POLICE,
et al., Defendants.**

**No. CA 81–0171.**

United States District Court,
District of Columbia.

July 5, 1983.

Arthur B. Spitzer, A.C.L.U., Joseph M. Sellers, Judith L. Harris, Pierson, Ball & Dowd, Washington, D.C., for plaintiff.

Asst. U.S. Atty R. Craig Lawrence, Washington, D.C., for defendants.

JOHN GARRETT PENN, District Judge.

### OPINION

Plaintiff brings this action for damages against the United States Capitol Police, the United States, and several officers of the Capitol Police force, for false arrest, false imprisonment, negligence, gross negligence, and violations of his constitutional rights. The case is presently before the Court on defendants' motion to dismiss or, in the alternative, for summary judgment on the entire action, and plaintiff's cross-motion for partial summary judgment on the issue of liability. Plaintiff also requests that the issue of damages be set for trial by jury.

### I

The material facts are not in dispute. On February 1, 1980 a ceremony was held on the West steps of the United States Capitol Building to welcome the official 1980 Winter Olympics Torch Relay Team. The event was authorized by Senate Resolution 342, 126 Cong.Rec. S574–575 (daily ed. Jan. 29, 1980), which stated that "such ceremony shall be open to the public."

Plaintiff attended the ceremony, situating himself at the edge of the crowd of approximately 100 spectators. He held a banner reading "OLYMPIC TORCH = FREEDOM! OLYMPIC PRISON = SLAVERY!", protesting the planned conversion of the Olympic housing facilities, after the Olympics, into a federal prison for youthful offenders. While he was present at the Capitol plaintiff also disseminated several leaflets expressing his position against using the Olympic dormitories as a prison.

Plaintiff did not acquire a permit to demonstrate prior to his arrival at the Capitol. Article XIX of the "Traffic Regulations for Capitol Grounds" ("traffic regulations") provides, in pertinent part:

### Section 153. Permits

In the interest of the orderly movement of vehicular, pedestrian, and other traffic on the Capitol Grounds, on and after the effective date of this article, no demonstration activity (as hereinafter defined in this article) shall be carried out on the United States Capitol Grounds except pursuant to the terms of a valid permit issued by the Capitol Police Board in accordance with this article and which has not been revoked as provided for therein.

Nothing in the record suggests that plaintiff would have obtained a permit if he had had sufficient time, but, in any event, he did not have time because he first learned of the ceremony earlier that morning.

At approximately 11:30 a.m., defendant Captain Harry Grevey, of the United States Capitol Police, approached plaintiff and informed him that he was demonstrating unlawfully because he did not have a permit. When plaintiff inquired whether the approximately twelve other persons holding banners or signs in the vicinity had permits, he was told that the Capitol Police could not allow, without a permit, the display of ideas which conflicted with the purpose of the ceremony. Plaintiff refused to leave or lower his banner. Shortly thereafter two other officers of the Capitol Police, defendants Yaworke and Mobbs, approached plaintiff and told him to lower his banner. When plaintiff again refused, he was arrested.

The parties agree that plaintiff was arrested, imprisoned, and later released, but they disagree as to the time plaintiff spent in custody. This dispute is not material to the pending motions as the time spent in custody is only relevant to damages which must be decided by a jury.

### II

Analysis of First Amendment rights in public places must begin with the words of

Justice Roberts in *Hague v. CIO,* 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939):

> Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens.

*See also United States v. Grace,* 461 U.S. 171, 103 S.Ct. 1702, 1708, 75 L.Ed.2d 736 (1983) ("Traditional public forum property occupies a special position in terms of First Amendment protection . . . ."), *aff'g in part and vacating in part Grace v. Burger,* 214 U.S.App.D.C. 375, 665 F.2d 1193 (1981).

The right to use public places for free expression extends beyond sidewalks and parks.[1] Among other places, this right has been recognized to exist on the grounds of the United States Capitol. *Jeannette Rankin Brigade v. Chief of Capitol Police,* 342 F.Supp. 575 (D.D.C.), *aff'd mem.,* 409 U.S. 972, 93 S.Ct. 311, 34 L.Ed.2d 236 (1972). *See generally United States v. Grace,* 103 S.Ct. at 1710 (Marshall, J., concurring in part and dissenting in part); *Grace v. Burger,* 214 U.S.App. D.C. at 380–381, 655 F.2d at 1198–1199.

But, the right to free exercise of expression in public places is not unbounded. Reasonable time, place and manner regulations may be imposed as long as they "are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Perry Education Assn. v. Perry Local Educators' Assn.,* 460 U.S. 37, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983). *See, e.g. Heffron v. International Society for Krishna Consciousness*

*(ISKON),* 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981) (state fair); *Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) (public school grounds); *Cox v. New Hampshire,* 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941) (parades on public streets).

### III

At the threshold, it is incumbent upon the Court to construe the traffic regulations, if possible, in a manner that would avoid the constitutional question. *United States v. Grace,* 103 S.Ct. at 1706. Toward this end the words in the regulations must be given their common meaning and modern usage. *Culver v. Secretary of Air Force,* 182 U.S.App.D.C. 1, 8, 559 F.2d 622, 629 (1977).

To accomplish this task the Court must first ascertain the confines of constitutionally permissible government restrictions. The standard for restricting access to inherently public places was first explicated in *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968):

> [A] government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*Accord, Heffron v. ISKON,* 452 U.S. at 647–649, 101 S.Ct. at 2564–2565; *Grace v. Burger,* 214 U.S.App.D.C. at 383–384, 665 F.2d at 1201–1202. Essentially this process involves balancing freedom of expression guarantees against conflicting governmental interests in a manner that restricts the

---

1. The use of public places as forums for expression is an especially sacred right in the District of Columbia. *See A Quaker Action Group v. Morton,* 170 U.S.App.D.C. 124, 131, 516 F.2d 717, 724 (1975) ("The general concepts of First Amendment freedom are given added impetus as to speech and peaceful demonstration in Washington, D.C., by the clause of the Constitution which assures citizens of their right to assemble peaceably at the seat of government and present grievances.").

former as minimally as possible. *A Quaker Action Group v. Morton*, 170 U.S.App. D.C. at 132, 516 F.2d at 725.

■ Permit systems have been used to effectuate this purpose. A permit requirement is a prior restraint on First Amendment rights, and as such must conform to the *O'Brien* standards. *See A Quaker Action Group v. Morton*, 170 U.S.App.D.C. at 134, 516 F.2d at 727. In *Cox v. New Hampshire*, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941), the Court upheld "time, place and manner" restrictions on processions and parades in public streets "to conserve the public convenience." *Id.* at 575–576, 61 S.Ct. at 765. The permit requirement served the purpose of notifying the authorities so they could provide policing, thereby ensuring order and obviating the confusion concomitant with overlapping parades. *Id.*

■ Certainly, where two groups are competing for the same area and one would truly interfere with the other, a first-come, first-served restriction is reasonable. This follows from the Supreme Court's admonishment that "the right of free speech ... does not embrace a right to snuff out the free speech of others." *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 387, 89 S.Ct. 1794, 1805, 23 L.Ed.2d 371 (1969). But, if there is no real conflict, then the government has no legitimate interest and should not be allowed to restrict free speech.

Under our Constitution, free speech is not a right that is given only to be so circumscribed that it exists in principle but not in fact. Freedom of expression would not truly exist if the right could be exercised only in an area that a benevolent government has provided as a safe haven for crackpots. The Constitution says that Congress (and the States) may not abridge the right to free speech. This provision means what it says. We properly read it to permit reasonable regulation of speech-connected activities in carefully restricted circumstances. But we do not confine the permissible exercise of First Amendment rights to a telephone booth or the four corners of a pamphlet, or to supervised and ordained discussion in a school classroom.

*Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 513, 89 S.Ct. 733, 740, 21 L.Ed.2d 731 (1969). *See also Perry Education Assn.*, 103 S.Ct. at 960 ("In a public forum, by definition, all parties have a constitutional right of access and the state must demonstrate compelling reasons for restricting access to a single class of speakers, a single viewpoint or a single subject."). In this case, plaintiff's presence did not obstruct traffic,[2] pedestrian or vehicular, nor did he promote confusion or otherwise interfere with the orderly proceeding of the ceremony. Moreover, plaintiff did not compete with the ceremony by imposing his views to the exclusion of the other message. He did not speak, and

---

**2.** A salient consideration in determining what entails a "reasonable time, place and manner" regulation, is the government's interest in ameliorating the "collateral consequences" of speech such as traffic congestion on a busy street during rush hour, overamplified noise levels, and the "capture" of an unwilling audience. *Grayned v. City of Rockford*, 408 U.S. at 115–116, 92 S.Ct. at 2303; *Home Box Office, Inc. v. FCC*, 185 U.S.App.D.C. 142, 180, 567 F.2d 9, 47, *cert. denied*, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977). Congress has a legitimate interest in being able to conduct its business without interference and in being secure from violence. And, the public has an interest in being able to safely visit the Capitol and to have the pathways and roads free from obstruction. *United States v. Nicholson*, Nos. 20210–69A et al. (D.C.Ct. of Gen. Sess. June 19, 1969), *aff'd*, 263

A.2d 56 (D.C.1970), cited in *Dellums v. Powell*, 184 U.S.App.D.C. 275, 290 n. 35, 566 F.2d 167, 182 n. 35, 197–205 (1977), *cert. denied*, 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978).

These factors are clearly not in issue in this case. First, no one disputes that plaintiff acted quietly and peaceably. Second, the West steps of the Capitol Building face the Mall and there is no vehicular traffic on this side of the Capitol; and the obstruction of pedestrian traffic caused by a single person standing quietly could only be minimal. In *Jeanette Rankin Brigade v. Chief of Capitol Police*, 342 F.Supp. at 584, the three-judge District Court said: "the Capitol Grounds ... are so extensive that demonstrations which may take place upon them might not be 'near' or 'in the immediate vicinity of' the Capitol itself."

thus interfere; he merely held a banner. Anyone who did not want to receive his message could simply avert his/her eyes. *See Cohen v. California*, 403 U.S. 15, 21, 91 S.Ct. 1780, 1786, 29 L.Ed.2d 284 (1971).

■ The mere fact plaintiff's message conflicted with the spirit of the ceremony does not bring this situation within the meaning of "overlapping parades or processions" as used in *Cox v. New Hampshire, supra.* Free debate and exchange of ideas are closely guarded rights in this country. *Terminiello v. City of Chicago*, 337 U.S. 1, 4, 69 S.Ct. 894, 895–896, 93 L.Ed. 1131 (1949). "Accordingly a function of free speech in our society is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Id.*

■ As intimated above the Court has a duty to consider the nature of plaintiff's conduct in each case. *Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc.*, 391 U.S. 308, 316, 88 S.Ct. 1601, 1607, 20 L.Ed.2d 603 (1968) (while the holding in this case was later overruled this premise remains intact). Picketing and handbilling can be extremely intrusive, or not at all, depending on how they are undertaken. In this case plaintiff peaceably disseminated handbills and silently held a banner. Similarly, in *Tinker* students wore black armbands in a "silent, passive expression of opinion" against the Vietnam War. 393 U.S. at 508, 89 S.Ct. at 737. The Court held that without a showing of interference with the school's work the school officials could not prohibit this exhibition of expression. *Id.* at 509, 89 S.Ct. at 738.

■ Finally, the Court must consider the attributes of the forum in question. This is germane to the constitutionality of any statute or regulation since the government's interests cannot be evaluated in a vacuum; rather they must reflect and be responsive to the nature of the place involved. In *Grayned v. City of Rockford*, 408 U.S. at 116–117, 92 S.Ct. at 2303, the Court said:

The nature of a place, "the pattern of its normal activities, dictate the kinds of regulations of time, place, and manner that are reasonable." ... The crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time. Our cases make clear that in assessing the reasonableness of a regulation, we must weigh heavily the fact that communication is involved; the regulation must be narrowly tailored to further the State's legitimate interest." (footnotes omitted)

*See also Heffron v. ISKON*, 452 U.S. at 650–651, 101 S.Ct. at 2565; *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 75, 101 C.Ct. 2176, 2186, 68 L.Ed.2d 671 (1981). The United States Capitol is a unique situs for demonstration activity, and must be treated accordingly. *See United States v. Nicholson, supra* note 2, at 182 n. 35; *cf. A Quaker Action Group v. Morton*, 170 U.S.App.D.C. at 134, 516 F.2d at 727 (unique attributes of the White House).

In *Edwards v. South Carolina*, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963), the Court overturned breach of peace convictions of 187 Black students who had demonstrated in an orderly manner on the South Carolina State House grounds. Although the Court refused to reverse the state court's determination that common law breach of peace had occurred—notwithstanding a total lack of evidence on that claim—it ruled that, nevertheless, the students' rights of free speech had been infringed. Justice Stewart said:

The circumstances in this case reflect an exercise of these basic constitutional rights in their most pristine and classic form. The petitioners felt aggrieved by laws of South Carolina which allegedly "prohibited Negro privileges in this State." They peaceably assembled at the site of the State Government and there peaceably expressed their grievances ....

*Id.* at 235, 83 S.Ct. at 683 (footnotes omitted).

In *Jeannette Rankin Brigade v. Chief of Capitol Police,* the Supreme Court affirmed, without opinion, a decision of a three-judge District Court holding unconstitutional a blanket prohibition on all processions or assemblages on the United States Capitol Grounds. The three-judge panel applied the *O'Brien* balancing test, weighing the fact that the Capitol is a place traditionally open to the public—thousands visit each year—to which access cannot be denied broadly or absolutely, against the government's interest in protecting against possible "damage to buildings and grounds, obstruction of passageways, and even dangers to legislators and staff." 342 F.Supp. at 583–585. They concluded that "the primary purpose for which the Capitol was designed—legislating—[is not] incompatible with the existence of all parades, assemblages, or processions which may take place on the grounds." *Id.* at 584; *see also Dellums v. Powell,* 184 U.S.App.D.C. 275, 566 F.2d 167 (1977), *cert. denied,* 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978) (*"Dellums I"*).

Two recent cases, *Heffron v. ISKON, supra,* and *Sanders v. United States,* 518 F.Supp. 728 (D.D.C. 1981), *aff'd mem.,* 679 F.2d 262 (D.C.Cir. 1982), illuminate the importance of investigating the attributes of the forum in question. In *Heffron* members of the Krishna religion asserted the right to disseminate information throughout the Minnesota Fair Grounds instead of being relegated to a booth as the fair regulations required of all exhibitors. The Supreme Court's denial of their request turned on the difference between the needs at fair grounds as opposed to those on public streets: "The Minnesota Fair ... is a temporary event attracting great numbers of visitors who come to the event for a short period ...." 452 U.S. at 651, 101 S.Ct. at 2565–2566. Thus, the orderly flow of the crowd and safety demands are more pressing than on a public street where the people expect it to be congested at times. *Id.*

In *Sanders* plaintiff entered the Pageant for Peace, on the Ellipse, placed three small signs beneath the South Carolina Christmas tree, and stood beside the tree holding a larger sign. His purpose was to publicize the "mysterious" deaths of three Black men in that State. The Court cited *Heffron* for the proposition that the government could consider not only the discrete impact of plaintiff's acts but also the cumulative impact that would result if other individuals decided to do the same. 518 F.Supp. at 729–730.

The Pageant for Peace and Minnesota State Fair are both short-lived events, attracting large crowds of people. The hypothetical cumulative impact described in *Sanders* is therefore a legitimate government concern in those contexts. On the other hand, the United States Capitol is a unique public forum for free expression, open to the public throughout the year.

Based on the above discussion the Court concludes that it can avoid addressing the constitutionality of the traffic regulations for any of the following three reasons.

A. *Plaintiff's Acts Did Not Constitute a "Demonstration" Under the Traffic Regulations.*

The term "demonstration" is defined by the traffic regulations as follows:

> As used in this article, the term "demonstration activity" means demonstrating, parading, picketing, speechmaking, holding of vigils, sit-ins, or other activities, conducted for the purpose of demonstrating approval or disapproval of governmental policies or practices (or the lack thereof), expressing a view on public issues, or bringing into public notice any issue or other matter.

Traffic Regulations, Article XIX, § 158. It is of course implicit in defendants' position that they believe plaintiff's conduct fell within the definition of "demonstration" under the traffic regulations.[3]

---

**3.** Webster's Third New International Dictionary of the English Language Unabridged (1963), defines demonstration as "a public display of group feeling (as of approval, sympathy, or antagonism) especially towards a person, cause, or action of public interest [while the delegates are

In *United States v. Bradley,* 418 F.2d 688 (4th Cir. 1969), two students were arrested for handing out leaflets at Fort Bragg, pursuant to a regulation prohibiting demonstrations there. In concluding that the activities in question did not constitute a demonstration the court said:

Such acts as picketing, sit-ins, protest marches, speeches and acts ordinarily associated with demonstrations, like parading, singing, and display of placards, all ... "inevitably intrude upon the senses of those within earshot or eyesight." The casual passerby cannot ignore the event—he must notice it and cannot escape exposure to its message.

Other modes of expression are much less conspicuous and insistent in their impact. The pure dissemination of information, unaccompanied by fanfare, is qualitatively different. Distribution of newspapers, for example, contrasts with the prohibited conduct in that the consumer may choose whether or not to avail himself of the proffer. Similarly, the person to whom a pamphlet is tendered may decide not to accept it. These activities are less intrusive and substantially different in kind from those enumerated in the Regulation.

....

... Everything depends on the demeanor that characterizes the enterprise. If it is mere dissemination of information, done in an unobtrusive and non-disruptive manner, then the Regulation does not reach it. On the other hand, if done with less circumspection, it may approach what the Regulation condemns. For example, if the operation were predominantly a mass demonstration we would have a different case.

In the present case numerous people were not milling about. Only two of the students passed out leaflets; and they did so with decorum. There is no indication that their behavior promoted disruption, confusion or inconvenience.

418 F.2d at 690–691 (footnotes omitted). In *Culver v. Secretary of Air Force,* 389 F.Supp. 331 (D.D.C. 1975), *aff'd,* 182 U.S. App.D.C. 1, 559 F.2d 622 (1977), the Court relied on *Bradley* in determining that the key factor in deciding whether a gathering of 200 people to protest the Vietnam War was a demonstration was whether a passerby could have avoided observing the activity if s/he so desired. *Id.* at 333.

In *United States v. Grace* one plaintiff distributed leaflets and the other held a sign on the sidewalk in front of the Supreme Court. The Court held that the portion of the statute making it unlawful "to parade, stand, or move in processions or assemblages," 40 U.S.C. § 13k, was not at issue in that case. 103 S.Ct. at 1711 & n. 5.

 Thus, the term "demonstration" as used in the traffic regulations should not be construed to encompass plaintiff's conduct in this case. His action did not inevitably intrude upon the senses of those persons in the immediate area as he acted peaceably, quietly and without forcing others to accept or observe his message. It is undisputed that plaintiff acted with decorum at all times.

 Moreover, if the traffic regulations were interpreted to reach plaintiff's conduct in this case, their inhibition of plaintiff's expressive rights would raise serious constitutional questions. Statutes should always be construed to avoid doubts as to their constitutionality. *Richmond Screw Anchor Co. v. United States,* 275 U.S. 331, 346, 48 S.Ct. 194, 198, 72 L.Ed. 303 (1928).

B. *The Traffic Regulations Were Wrongfully Applied to Plaintiff's Conduct As He Was Arrested Due to the Content of His Expression.*

When plaintiff was confronted by Capitol Police officers he inquired whether the approximately twelve other individuals holding banners and signs in the vicinity of the ceremony had permits to demonstrate. He

---

howling and conducting their [demonstration]s the leaders may be quietly engaged in the high-

est statemanship—D.D. McKean]."

was informed that they did not but their conduct was not proscribed because their messages did not conflict with the spirit of the ceremony.

Plaintiff asserts, and defendants do not contest, that no permit was issued for the ceremony because it was held pursuant to a Senate Resolution.[4] Assuming, without deciding, that Congress has a right to waive the permit requirement for its own demonstrations, the approximately twelve other individuals carrying signs and banners had no greater right to stand near the ceremony and express themselves without a permit than did plaintiff.[5]

■■■■ Plaintiff was singled out due to the content of his expression. It is a rudimentary, yet fundamental principle of constitutional law that any restriction on expressive activity because of its content is repugnant to the constitution, *Police Department of City of Chicago v. Mosley*, 408 U.S. 92, 96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972), and is only justifiable under the doctrines of obsenity, "fighting words" or "clear and present danger." *Home Box Office, Inc. v. FCC*, 185 U.S. App.D.C. at 181, 567 F.2d at 48; *see also Cohen v. California*, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971); *cf. Cox v. New Hampshire*, 312 U.S. at 574, 61 S.Ct. at 765 ("[T]he question in a particular case is whether that control [regulation of expressive conduct] is exerted so as not to deny or unwarrantedly abridge the right of assembly and the opportunities for the communication of thought and the discussion of public questions immemorially associated with resort to public places.").

C. *Plaintiff's Conduct Did Not Conflict With the Intent of the Traffic Regulations.*

While the intent of the traffic regulations—to protect the orderly movement of traffic and provide an unfettered forum for groups with valid permits—is salutary and justifies a permit system, plaintiff's actions did not conflict with these purposes and should not have been stifled.

As in *Edwards v. South Carolina, supra,* plaintiff caused no obstruction of pedestrian or vehicular traffic and did not threaten or provoke violence of any sort. To uphold his arrest and imprisonment would legitimate wholesale restrictions on conflicting demonstrative activities, and thereby inhibit debate, possibly "as a subterfuge for the suffocation of speech." *Washington Mobilization Committee v. Cullinane,* 184 U.S.App.D.C. 215, 227, 566 F.2d 107, 119 (1977).

■■■■ Plaintiff did not interfere with the ceremony, nor did he obstruct traffic. The traffic regulations should not have been construed to apply to plaintiff's conduct, as such application did not comport with their intent. *See Abney v. United States,* 451 A.2d 78 (D.C.1982) (Traffic Regulations for the United States Capitol Grounds unconstitutionally applied to defendant due to lack of evidence that he actually or potentially interfered with traffic on the Capitol Grounds).

IV

A. *Jurisdiction to Award Damages.*

Plaintiff requests damages against the Capitol Police and the individual defendants for false arrest and false imprisonment, in violation of his Fourth Amendment right to be free from unwarranted interference with his personal liberty. *Dellums v. Powell,* 184 U.S.App.D.C. 324, 332–335, 566 F.2d 216, 224–227 (1977), *cert. denied,* 438 U.S. 916, 98 S.Ct. 3147, 57 L.Ed.2d 1161 (1978) (*"Dellums II"*); *Dellums I,* 184 U.S. App.D.C. at 283, 566 F.2d at 175. He also seeks redress against the individual defendants alone for unjustified infringement of

---

**4.** Plaintiff also argues that the traffic regulations were not applicable to his conduct because the Senate Resolution stated that "such ceremonly shall be open to the public." Due to the Court's holding it is not necessary to reach this issue.

**5.** Under the traffic regulations, demonstrations of approval of governmental policies or practices are no less demonstrations than demonstrations of disapproval. *See* page 12 *supra.*

his First Amendment rights to speak and communicate with an audience. *See Dellums I,* 184 U.S.App.D.C. at 303, 566 F.2d at 195.

1. *Action Against the Individual Federal Officers.*

■ "*Bivens [v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)]* established that the victims of a constitutional violation by a federal agent have a right to recover damages against the official in federal court despite the absence of any statute conferring such a right." *Carlson v. Green,* 446 U.S. 14, 18, 100 S.Ct. 1468, 1471, 64 L.Ed.2d 15 (1980). This right of action was explicitly extended to redress First Amendment violations in *Dellums I,* 184 U.S.App.D.C. at 302, 566 F.2d at 194. Plaintiff, therefore states a valid cause of action against the individual officers of the United States Capitol Police for false arrest, false imprisonment and First and Fourth Amendment violations.

2. *Action Against the United States and the United States Capitol Police.*[6]

■ Absent an express indication to the contrary, sovereign immunity precludes damage actions against the United States, *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607 (1980), including those actions arising in the context of constitutional torts. *See Bivens,* 403 U.S. at 410, 19 S.Ct. at 2012 (Harlan, J., concurring). The post-*Bivens* amendments to the Federal Tort Claims Act ("FTCA"), embodied in 28 U.S.C. § 2680(h), waive governmental immunity for the intentional torts of false arrest and false imprisonment, so plaintiff has a cause of action against the United States and the United States Capitol Police on these grounds. *See Carlson v. Green,* 446 U.S. at 20, 100 S.Ct. at 1472.

■ Turning to the First Amendment claim, under the FTCA citizens do not have a cognizable cause of action against the federal government for violations of their constitutional rights by federal officers unless they specify an underlying tort covered by the Act. *See* Note, *Constitutional Tort Remedies: A Proposed Amendment to the Federal Tort Claims Act,* 12 Conn.L.Rev. 492 (1980).[7] In this case, as in *Dellums I,* the false arrest and imprisonment claims relate to plaintiff's Fourth Amendment allegations, whereas the alleged First Amendment· violations concern the infringement of plaintiff's right to communicate to the public and to Congress. As plaintiff recognizes,[8] there are no additional torts involved, and he therefore does not have a cause of action against the United States or the United States Capitol Police under the First Amendment.

B. *False Arrest and False Imprisonment Claim—Against All Defendants.*

■ The focal point of a tort action for false arrest and false imprisonment, in either their common law or constitutional

---

6. In their motion for summary judgment defendants asserted that plaintiff failed to exhaust his administrative remedies. Defendants' Memorandum at 3–5. Subsequently, plaintiff retained counsel, submitted a claim for monetary relief to the United States Capitol Police, received a final denial of that claim, and filed an Amended Complaint alleging exhaustion of administrative remedies. Plaintiff's Memorandum at 18–19. It appears that defendants are no longer pursing this argument.

7. While a few courts have inferred a waiver under the FTCA for constitutional tort claims they have done so only where there were underlying common law torts. See *Black v. Sheraton Corp. of America,* 184 U.S.App.D.C. 46, 54–55, 564 F.2d 531, 539–540 (1977); *see also* Hon. C. Richey, *Manual on Employment Discrimination and Civil Rights Actions in the Federal Courts* E5 (revised ed. 1980). Moreover, in recent decisions the Supreme Court has strictly construed the FTCA as a waiver of sovereign immunity. Note, *Constitutional Tort Remedies,* 12 Conn.L. Rev. at 511 n. 93.

8. Plaintiff does not contend that he has a cause of action against the federal government under the First Amendment. *See* Plaintiff's Memorandum at 19–21.

variants,[9] "is whether the arresting officer was justified in ordering the arrest of the plaintiff; if so, the conduct of the arresting officer is privileged and the action fails." *Dellums I*, 184 U.S.App.D.C. at 283, 566 F.2d at 175.

■■■ Under District of Columbia law, plaintiff must show that he was imprisoned and that the imprisonment was unlawful. The former is a jury issue and the latter is presumed once there has been an allegation that "plaintiff was arrested and imprisoned without process." *Clarke v. District of Columbia*, 311 A.2d 508, 511 (D.C.1973). The burden then shifts to defendant who must justify the arrest by showing either probable cause or the lesser requirement of good faith. *See Dellums I*, 184 U.S.App. D.C. at 283–284, 566 F.2d at 175–176.

■■■ To establish good faith the federal officers must show "reasonable grounds to believe a crime had been committed and that plaintiff's arrest was made for the purpose of securing the administration of the law ...." *Id.* at 283, 566 F.2d at 175. Good faith has "objective" and "subjective" elements, the ultimate test being whether the official "act[ed] sincerely and with a belief that he [was] doing right ...." *Wood v. Strickland*, 420 U.S. 308, 321, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975). Moreover, while federal officers are not "charged with predicting the course of constitutional law," *Pierson v. Ray*, 386 U.S. 547, 557, 87 S.Ct. 1213, 1219, 18 L.Ed.2d 288 (1967), they may not ignore or disregard well settled constitutional rights,[10] nor may they act with actual mal-

ice.[11] *Wood v. Strickland*, 420 U.S. at 321–322, 95 S.Ct. at 1000–1001.

■■■ In this case plaintiff was allegedly arrested and imprisoned without process, so defendants have the burden of proving good faith or probable cause. Essentially they must show, at a minimum, an honest belief that plaintiff was violating the laws and that this belief was reasonable in light of the facts and law at the time. *See Dellums I*, 184 U.S.App.D.C. at 285, 566 F.2d at 177.

Defendants contend that they had probable cause and acted in good faith because plaintiff had no permit to demonstrate. Plaintiff responds by asserting that he did not need a permit to express his views at an event "open to the public,"[12] and that the permit requirement is unconstitutional on its face as it applied to him. Finally plaintiff argues that even if defendants were acting pursuant to the permit regulations, his arrest was based on the content of his speech which violates one of the most fundamental concepts of constitutional law. All this, plaintiff argues, amounts to bad faith as a matter of law.

■■■ In this jurisdiction probable cause is a mixed question of law and fact. The jury decides facts in dispute. If, however, the undisputed facts, viewed in a light most favorable to plaintiff, establish probable cause as a matter of law, summary judgment should be granted to defendants. *Lansburgh's, Inc. v. Ruffin*, 372 A.2d 561, 564–565 (D.C.1977). Defendants have not shown probable cause as a matter of law, nor have they exhibited reasonable and good faith reliance on the regulation (as it

---

9. Since both the common law and constitutional torts of false arrest and false imprisonment protect Fourth Amendment freedoms, the mechanics of pleading and proving a prima facie case are the same in either situation. *Dellums I*, 184 U.S.App.D.C. at 283–284, 566 F.2d at 175–176.

10. Under *Pierson* "an officer can be held liable when acting under a statute which has not been declared unconstitutional, if it is found that he or she should have anticipated that the statute could not pass constitutional muster." *Shifrin v. Wilson*, 412 F.Supp. 1282, 1296 n. 15 (D.D.C. 1976).

11. Plaintiff concedes that the officers were not acting with actual malice. Plaintiff's Reply Memorandum at 9.

12. While the words "open to the public" are compelling on their face, plaintiff shows no precedent to give this argument legal support. In fact, all the cases that uphold restrictions on expression in public places grew out of events and forums open to the public. However, the Court need not reach this limited issue. *See* note 4 *supra.*

applied to plaintiff) as a matter of law. Reasonableness and good faith are questions usually reserved for the finder of fact and should be submitted to the jury in this case.

■■■ Unrelated to the probable cause, good faith and reasonableness defenses to the intentional torts alleged in this case, in any *Bivens* action federal officers have a qualified immunity defense, also based on good faith and reasonableness. *Dellums I,* 184 U.S.App.D.C. at 284, 566 F.2d at 176. While the two defenses are separate and distinct, in this case they have identical elements of proof. *Id.; see also Scheuer v. Rhodes,* 416 U.S. 232, 247–248, 94 S.Ct. 1683, 1692, 40 L.Ed.2d 90 (1974) (to establish good faith the officers must show "reasonable grounds for the belief [that cause for action existed] formed at the time and in light of all the circumstances, coupled with good-faith belief"); *Gomez v. Toledo,* 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980) (burden is on defendant to plead good faith as an affirmative defense).

Plaintiff argues that notwithstanding the outcome of the officers' qualified immunity defense the liability of the United States is not coterminous with that of its officers. Rather, the extent of the government's waiver of immunity under the FTCA should be determined by federal law, which points to broader liability for the government. Plaintiff's Reply Memorandum at 11–21. The Court does not need to reach this troubling issue, however, due to the unique posture of this case.

As shown *supra* a showing of good faith and reasonableness establishes both a qualified immunity defense *and* a direct defense to the intentional torts of false arrest and false imprisonment. Plaintiff acknowledges that he must prove the underlying tort before the United States can be found liable under the FTCA. Plaintiff's Reply Memorandum at 20. Since a showing of good faith and reasonableness not only triggers qualified immunity *but also defeats the tort claims* the inquiry in this case need not go beyond good faith and reasonableness to determine the liability of the United States. In each of the cases cited by plaintiff in support of his theory that the United States can be found liable even if the federal officers are not found liable, the torts alleged against the United States did not have good faith and reasonableness as a defense. *See Picariello v. Fenton,* 491 F.Supp. 1026 (M.D.Pa.1980) (plaintiff subject to battery when he was confined in restraints in his jail cell); *Crain v. Krehbiel,* 443 F.Supp. 202 (N.D.Cal.1977) (claim under California law for intentional infliction of emotional distress); *Norton v. Turner,* 427 F.Supp. 138 (E.D.Va.1977), *rev'd,* 581 F.2d 390 (4th Cir.1978), *cert. denied,* 439 U.S. 1003, 99 S.Ct. 613, 58 L.Ed.2d 678 (1979) (illegal search and seizure which is violation of FTCA). In those cases the courts concluded that "[t]he immunity of individual officers does not serve to defeat the existence of a tort—it merely provides a defense to monetary liability" *Norton,* 427 F.Supp. at 146. As discussed above, a showing of good faith and reasonableness would defeat not only the officers' liability here but also "the existence of a tort."

■■■ Thus, whether or not the liability of the United States is generally coterminous with that of its officers, the liability of all the defendants in this case for false arrest and false imprisonment is governed by whether the officers acted in good faith and with reasonableness. If they acted in such a manner, the tort would be defeated, and no one could be held liable.

**C. *First Amendment Violation— Against the Individual Officers.***

■■■ In *Dellums I,* 184 U.S.App.D.C. at 302–303, 566 F.2d at 194–195, the court said:

> If [plaintiff was] arrested while lawfully exercising "basic constitutional rights in their most pristine and classic form," the violation of First Amendment rights is directly attributable to the arresting officers.

Liability, therefore, turns solely upon whether plaintiff's First Amendment rights

were violated. There is no good faith or reasonableness defense.

Since plaintiff was unlawfully arrested while exercising First Amendment rights, he is entitled to recover damages. The extent of those damages will, of course, be decided by a jury; however, the damages attributable to this violation stem from the loss of opportunity to express one's views, and must be commensurate with the actual loss incurred. *Id.* at 303, 566 F.2d at 195.

## V

Based on the above the Court concludes that plaintiff was unlawfully arrested by the United States Capitol Police, and is entitled to present his claim for damages to a jury. An appropriate Order shall issue.