Michael A. **KROLL**

v.

**UNITED STATES CAPITOL POLICE, et al., Appellants.**

No. 83–2014.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 27, 1988.

Decided June 7, 1988.

As Amended June 21, 1988.

R. Craig Lawrence, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., and Royce C. Lamberth,* Asst. U.S. Atty., Washington, D.C., were on the brief, for appellants. Michael J. Ryan, Asst. U.S. Atty., Washington, D.C., also entered an appearance for appellants.

Joseph M. Sellers, with whom Judith L. Harris, Robert A. Feitel and Arthur B. Spitzer, Washington, D.C., were on the brief, for appellee.

Before ROBINSON, MIKVA and STARR, Circuit Judges.

* At time brief was filed.

Opinion for the Court by Circuit Judge STARR.

Opinion concurring in the judgment by Circuit Judge ROBINSON.

STARR, Circuit Judge:

This case is before us following a remand to the District Court. The issue on appeal is whether appellants are entitled on summary judgment to the protections of qualified immunity under governing Supreme Court precedent. We conclude that they are.

## I

The facts can be briefly stated. In January 1980, the United States Senate passed a resolution authorizing a ceremony at the Capitol to welcome the Olympic Torch Relay Team, as the bearers of the Olympic Flame wended their way to Lake Placid, New York, the site of the 1980 Winter Olympics. The resolution provided in pertinent part as follows:

> *Resolved,* That the 1980 Winter Olympics Torch Relay Team shall be honored by a welcoming ceremony on the steps of the United States Capitol Building on February 1, 1980, such ceremony shall be open to the public ... under conditions to be provided by the Capitol Police Board.

S.Res. 342, 96th Cong., 2d Sess., 126 Cong. Rec. S. 574–75 (daily ed. Jan. 29, 1980), Joint Appendix ("J.A.") at 53–56.

Pursuant to the duly publicized invitation, various members of the public responded to the call, with approximately 100 spectators in attendance. *Kroll v. United States Capitol Police,* 590 F.Supp. 1282, 1286 (D.D.C. 1983). Among the spectators was the appellee, Michael Kroll, who displayed a banner containing the following message:

OLYMPIC TORCH = FREEDOM.
OLYMPIC PRISON = SLAVERY!

Amended Complaint at ¶ 14, J.A. at 59. The sign protested the anticipated ultimate use of the Olympic dormitories at Lake Placid as a federal correctional facility for youthful offenders. 590 F.Supp. at 1282.

Captain Harry Grevey of the United States Capitol Police Department approached Mr. Kroll and inquired whether he had a permit to demonstrate. Mr. Kroll replied that he did not, whereupon Captain Grevey requested him to lower his sign. Mr. Kroll observed in response that other spectators in attendance at the ceremony were carrying signs and inquired whether those individuals possessed permits. Captain Grevey indicated that the other sign holders did not have permits, but that Mr. Kroll's sign, in contrast to the others, conflicted with the spirit of the welcoming ceremony. Mr. Kroll continued to decline either to lower his banner or to leave the ceremony. Shortly thereafter, two other officers of the Capitol Police (appellants Yaworske and Mobbs) approached Mr. Kroll and advised him once again to lower his banner. Mr. Kroll persisted in his refusal, whereupon he was arrested and taken into custody. Several hours later, he was released on his own recognizance. J.A. at 41. Charges against him were subsequently dropped. Brief for Appellee at 4.

In January 1981, Kroll filed the present action in federal district court. He

1. Mr. Kroll named as defendants the United States Capitol Police, five individual officers, and the United States. Mr. Kroll's complaint alleged—in addition to asserted violations of his constitutional rights under the First, Fourth, and Fifth Amendments—false arrest, false imprisonment, negligence, and gross negligence.

2. That conclusion was based upon the trial court's analysis along the following lines: (a) the right to free exercise of expression in public places was subject to reasonable time, place, and manner regulations, so long as those regulations "'are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.'" *Id.* at 1287 (quoting *Perry Educ. Ass'n v. Perry Local Educators Ass'n,* 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983)); (b) the governing permit regulation, section 153 of the Traffic Regulations for Capitol Grounds, *see infra* note 3, was facially valid, but Mr. Kroll's situation did not present a "real conflict" between two groups competing for the same area, *id.* at 1288, nor did his presence obstruct traffic or otherwise interfere with the ceremony; and (c) the fact that Kroll's "message conflicted with the spirit of the ceremony" did not warrant invocation of the permit requirement. Based on this analysis, the District Court sought

claimed, among other things, that five named Capitol Police officers had violated his First Amendment rights and requested compensatory damages in the amount of $100,000 and punitive damages in the same amount.[1] On cross-motions for summary judgment, the District Court concluded that "[l]iability ... turns solely upon whether plaintiff's First Amendment rights were violated. There is no good faith or reasonableness defense." 590 F.Supp. at 1295–96. On the constitutional question, the court concluded: "Since plaintiff was unlawfully arrested while exercising First Amendment rights, he is entitled to recover damages." *Id.* at 1296.[2] The trial court determined that Mr. Kroll's conduct did not constitute a "demonstration" within the meaning of the applicable permit regulations.[3] In addition, the court held that the regulations were wrongfully applied to Mr. Kroll, in that he was singled out solely by virtue of the content of his message. In sum, since plaintiff did not interfere with the ceremony, "[t]he traffic regulations should not have been construed to apply to plaintiff's conduct, as such application did not comport with their intent." *Id.* at 1292.

to construe the traffic regulations in such a way as to avoid ruling on their constitutionality under the First Amendment.

3. Section 153 of the applicable regulations provides as follows:

In the interest of the orderly movement of vehicular, pedestrian, and other traffic on the Capitol Grounds, on and after the effective date of this article, no demonstration activity (as hereinafter defined in this article) shall be carried out on the United States Capitol Grounds except pursuant to the terms of a valid permit issued by the Capitol Police Board in accordance with this article and which has not been revoked as provided for therein.

Traffic and Motor Vehicle Regulations for the United States Capitol Grounds, J.A. at 47.

Section 158 defines "demonstration activity" as: demonstrating, parading, picketing, speechmaking, holding of vigils, sit-ins, or other activities, conducted for the purpose of demonstrating approval or disapproval of governmental policies or practices (or lack thereof), expressing a view on public issues, or bringing into public notice any issue or other matter.

*Id.,* J.A. at 63.

On appeal, the officers contended that the trial court erred in not upholding their claim of qualified immunity under *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), a decision which the District Court did not mention in its analysis. In the officers' view, their conduct comported fully with the strictures of the First Amendment, in that they had merely enforced in straightforward fashion a permit system which had never been held unconstitutional. In any event, they further asserted, their conduct fell well within the ambit of *Harlow*'s reach, inasmuch as their actions with respect to Mr. Kroll did not constitute the violation of a "clearly established" right within the meaning of *Harlow.* Following oral argument, this court remanded the record to the District Court for a statement of reasons for its determination that qualified immunity was unavailing.

On remand, the District Court reiterated the fact of the unconstitutional nature of appellants' actions and that it was clearly established in law that content-neutral enforcement was indispensable to the lawful administration of a permit system, 683 F.Supp. 824. In this case, the court reiterated, the Capitol Police singled out Mr. Kroll's banner solely on account of the content of its message. Since content discrimination is at the core of forbidden governmental action, the District Court concluded that *Harlow* immunity would not lie.

## II

At the outset, it is important to recognize what this case is not about. Under *Harlow* and its progeny, defendants' entitlement to qualified immunity raises only a narrow

question. We need not resolve, therefore, the extent to which the First Amendment allows the arrest of lone demonstrators who—on the basis of the signs they carry—are perceived by police as not belonging to a group that has secured a demonstration permit. Rather, the sole issue on this appeal is whether this aspect of First Amendment law was so "clearly established" at the time of the Olympics ceremony that a reasonable police officer faced with Kroll's behavior would not have thought it lawful to arrest him.[4] We turn, then, to the particular facts that are relevant to the qualified immunity inquiry.

In the first place, this record shows unmistakably that the event in question—the welcoming ceremony for the Olympic Torch Relay Team—was conducted under the auspices of a specific Senate Resolution. That resolution by its terms referred to a specific event to be conducted under conditions to be provided by the Capitol Police Board. Under these circumstances, a reasonable officer would conclude, in our view, that the activity in question was in the nature of an event carried on within the ambit of the Capitol Police Board permit system. The Senate Resolution would not have been taken to portend the temporary suspension of Congress' permit system—conveying an invitation to the public generally to come to the site of the welcoming ceremony for reasons other than to welcome the Relay Team. The Senate Resolution would, in short, reasonably have been viewed by the Capitol Police as the functional equivalent of a permit.[5] That is particularly true in light of the oddity of having the United States Senate "apply" for a permit from its own Police Board. The Capitol Police could

4. The relevant question ... is the objective (albeit fact-specific) question whether a reasonable officer could have believed [the officer]'s warrantless search to be unlawful, in light of clearly established law and the information the searching officers possessed. [The officer]'s subjective beliefs about the search are irrelevant.
*Anderson v. Creighton,* —— U.S. ——, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987).
[I]t should first be determined whether the actions [plaintiff] allege[s the officer] to have taken are actions that a reasonable officer

could have believed lawful. If they are, then [the officer] is entitled to dismissal prior to discovery.
*Id.* at 3042 n. 6.

5. Relevant to our *Harlow* analysis, Officer Mobbs' incident report recounted that "[t]his incident occurred during the Olympic Torch Ceremony which was approved by Senate Resolution SR–342." Plaintiff's Reply to Defendants' Opposition to Plaintiff's Motion for Summary Judgment, Exhibit A.

reasonably believe that the Senate, like the House, could "trump" the operation of its own permit system, which by its nature applies to those outside the Capitol Hill community of Members of Congress (and their staffs).

Once this basic point is appreciated, the remainder of the proper analysis under *Harlow* and its progeny becomes clear. *See Anderson v. Creighton*, — U.S. —, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). In light of the state of First Amendment law in 1980, the five officers in 1980 could reasonably have concluded that the very existence of a permit system carried with it the principle of exclusivity. Judgments about the message being conveyed by a particular demonstrator,[6] a reasonable officer could have concluded, are inherent in the implementation of a permit system. Otherwise, the Capitol Police would have been authorized to issue permits, but do nothing when counterdemonstrators chose to intrude into the area of the "permitted" activity and carry on their efforts to communicate a different (or indeed possibly conflicting) message. To take a familiar example, pro-choice or anti-abortion pickets may not constitutionally be forbidden an opportunity to communicate their respective messages simply by virtue of their nature or content; but the Capitol Police could, we believe, reasonably have concluded that they could lawfully direct an anti-abortion picketer away from the area set aside under a permit to those communicating a pro-choice viewpoint (or *vice versa*).

Our *Harlow* analysis does not, as might be thought at first blush, compromise the timeless First Amendment principle of content neutrality. Governmental neutrality as to content stands at the heart of the First Amendment's protections against the powers of government. That, in large measure, is what the Free Speech Clause is all about.

But that principle is not at risk under the specific circumstances presented here, where the Capitol Police could reasonably believe that they were enforcing a valid permit system. *See Sanders v. United States*, 518 F.Supp. 728 (D.D.C.1981), *aff'd mem.*, 679 F.2d 626 (D.C.Cir.1982) (upholding the arrest of a lone demonstrator who had intruded into an area set aside for a separate, permitted event against First Amendment challenge). Unless First Amendment law pointed clearly in an opposite direction, the officers could in 1980 have come reasonably to the view that *enforcement* of a permit system inevitably requires taking cognizance of content. Otherwise, as our abortion hypothetical suggests, it would be impossible to separate non-permitted activity from activity that did enjoy the authorization conferred by a permit.

The principle of content neutrality does not, in sum, mean that a permit system exists only as an office operation without enforcement capability. Indeed, what a constitutionally constructed permit system cannot do is *forbid* an activity on the basis of the content of the message. Preclusion of a message is the evil at which the content-neutrality principle is aimed, not arrangements of a public forum so that individuals and groups can be heard in an orderly and appropriate manner.

In fact, it is common ground that permit systems are permissible under the First Amendment. Not only do the parties agree on this fundamental point, but the District Court specifically embraced that long-standing proposition. Permit systems are the embodiment of time, place, and manner restrictions that have long enjoyed the approbation of the Supreme Court. *See Heffron v. International Society for Krishna Consciousness, Inc.*, 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1980); *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *Adderley v. Florida*, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966); *Kovacs v. Cooper*, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949); *Cox v. New Hampshire*, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941).

---

**6.** Capitol Hill belongs to the people, but to go beyond the role of tourist or visitor to that of communicator of messages through banners, pamphleteering, and the like obviously requires compliance with the duly ordained permit system which Congress has seen fit to establish.

## III

These basic propositions go far toward deciding the specific qualified immunity issue before us. No contention has been advanced that the Capitol Police were seeking to bar Mr. Kroll from the Capitol grounds or otherwise to preclude him from securing a permit.[7] The salient point was that Mr. Kroll had failed to obtain (or even apply for) a permit, not that he would be denied a permit were he to seek one.[8]

This case is thus quite unlike the circumstances before the Supreme Court in the case of *Police Dep't of Chicago v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972), on which Mr. Kroll extensively relies. There, Mr. Mosley was carrying on a solitary demonstration against the discriminatory practices of a local high school. His conduct ran afoul of a city ordinance prohibiting *all* forms of picketing, save for peaceful labor picketing, within 150 feet of school grounds. The exclusionary bar embodied in the Chicago permit regime operated to foreclose Mr. Mosley's carrying on his message even though his counterparts engaged in labor picketing would be enabled lawfully to carry on adjacent to the school. This scheme was roundly condemned by the Supreme Court as violating bedrock principles of content neutrality.[9]

In contrast to the situation in *Mosley,* we need not tarry long in finding under the circumstances here that the conduct of the Capitol Police fell well within *Harlow*'s protective reach. Viewing the banner displayed by Mr. Kroll, the officers could reasonably conclude that his sign represented a protest against the intended disposition of Olympic dormitories for correctional purposes. Indeed, it was Mr. Kroll's hope and intent to convey precisely that message. This message, a reasonable officer could further conclude, was not consonant with the specific purpose articulated in the Senate Resolution of welcoming the Olympic Torch Relay Team. That is to say, the Capitol Police could reasonably have believed that an individual carrying on a demonstration for or against some aspect of public policy was engaging in activity unauthorized by the specific terms of the Senate Resolution. That being so, appellants' actions in enforcing the resolution cannot rightly be condemned as violative of clearly established principles of First Amendment law.[10]

*Reversed and remanded.*

---

7. Nor does plaintiff contend that other signs addressed issues similarly unrelated to the purpose for which the public was invited—to welcome the torch bearers—but that Mr. Kroll was singled out because the officers disagreed with the sentiment expressed by his particular message. On the contrary, Mr. Kroll asserts that the signs displayed by others in his vicinity all "pertain[ed] to the Olympic Torch Ceremony," Second Amended Complaint at ¶ 13, J.A. at 59, and that, "to the best of Mr. Kroll's knowledge [these signs] contained different messages, messages that were unlike his, uncritical of a governmental policy." Transcript of Proceedings, October 4, 1982 at 22, J.A. at 100 (statement by plaintiff's counsel at oral argument before the District Court on cross-motions for summary judgment).

8. Indeed, the Capitol Police Board's regulations require it to issue permits on a first-come, first-served basis as long as the applicant meets applicable procedural requirements and the activity does not conflict with another event. If the Board fails to act within 48 hours of receipt of a properly submitted application, the application is deemed to be approved. *See* § 155, J.A. at 48.

9. For similar reasons, the Supreme Court's recent decision in *Boos v. Barry,* — U.S. —, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988), is inapposite to our analysis concerning events which occurred in 1980. Moreover, the statute at issue in *Boos* involved a content-based restriction on speech that choked off *all* picketing critical of a foreign government within 500 feet of its embassies.

10. At oral argument, counsel for Mr. Kroll argued that the enforcement of a permit system should not encompass situations in which there is no interference with the permitted activity. *See also* Brief for Appellee at 15 (citing *Women Strike for Peace v. Morton,* 472 F.2d 1273 (D.C. Cir.1972)); *cf. Pledge of Resistance v. We the People 200, Inc.,* 665 F.Supp. 414 (E.D.Pa.1987). We decline to embrace any broad First Amendment holding in this respect. In our view, for reasons stated in the text, a Capitol Police officer in 1980 could reasonably have concluded that he or she was acting lawfully in enforcing the terms of a permit system. That is so regardless of whether the competing demonstrations involved a clear danger of violence, as Mr. Kroll suggested on appeal as the appropriate enforcement standard, or a lesser standard of "substantial interference" or merely "disruption." As we view the state of the law in 1980, it was not clearly established that in the administration of

SPOTTSWOOD W. ROBINSON, III, Circuit Judge, concurring in the judgment:

I agree that the principles enunciated in *Harlow v. Fitzgerald*[1] and its progeny, including particularly *Anderson v. Creighton*,[2] entitled appellants to qualified immunity from civil damages consequent upon any constitutional transgression born of Kroll's arrest. I am satisfied that notwithstanding the true fact,[3] a Capitol police officer could reasonably have believed that Senate Resolution 342[4] was tantamount to a formal permit to display signs welcoming and applauding the Olympic Torch Relay Team, while Kroll, whose sign could hardly have been so interpreted, was demonstrating without a permit. I also share my colleagues' concern that, if possible, this appeal be disposed of on the narrow but self-sufficient ground of immunity, and I would leave the troubling constitutional questions engendered by the parties' positions for resolution in a case squarely posing them as essential issues.[5]

I hasten, however, to add my conviction that while in 1980 Capitol policemen might reasonably have equated the resolution with a permit to welcome and honor the Torch Relay Team more tangibly and enthusiastically than mere presence would, close inspection of the resolution reveals that it did not actually authorize anyone to demonstrate. In unmistakable language, the resolution purported to do no more than call for the welcoming ceremony and invite the public to attend.[6] Moreover, treatment of the resolution as a permit to demonstrate erroneously attributed a constitutionally-questionable act to the Senate: allowing those supporting the 1980 Winter Olympics to express themselves, while banning those who would expound a contrary point of view.[7] Mere sponsorship of the ceremony was no indication that the Senate designed the resolution as the equivalent of a content-neutral permit system, in which the speed with which one applies, rather than one's message, determines whether a particular permit is to issue.[8] Nor did the

a permit system the officers had to await actual disruption or interference before requesting or directing individuals to comply with the requirements of the permit system.

Our disposition of the narrow *Harlow* issue presented on appeal obviously has no effect upon appellees' additional claims which remain pending. Indeed, at oral argument counsel for the Government suggested that the case be remanded so that Mr. Kroll's claims of false arrest and false imprisonment under the Federal Tort Claims Act may proceed. *See supra* note 1. That is precisely the result of our disposition today.

1. 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

2. —— U.S. ——, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

3. See notes 6–8 *infra* and accompanying text.

4. S.Res. 342, 96th Cong., 2d Sess., 126 Cong.Rec. 1131 (1980).

5. Two fundamental considerations persuade me to this course of action. First, questions of qualified immunity are to be decided at the earliest possible stage of a litigation. *Anderson v. Creighton, supra* note 2, —— U.S. at ——, 107 S.Ct. at 3038, 97 L.Ed.2d at 530; *Harlow v. Fitzgerald, supra* note 1, 457 U.S. at 818, 102 S.Ct. at 2738, 73 L.Ed.2d at 410. Second, a federal court should not decide a constitutional question when a dispositive nonconstitutional is-

sue is present. E.g., *Jean v. Nelson*, 472 U.S. 846, 854, 105 S.Ct. 2992, 2997, 86 L.Ed.2d 664, 671 (1985); *New York City Transit Auth. v. Beazer*, 440 U.S. 568, 582, 99 S.Ct. 1355, 1364, 59 L.Ed.2d 587, 600 (1979).

6. In relevant part, the resolution provided simply "[t]hat the 1980 Winter Olympics Torch Relay Team shall be honored by a welcoming ceremony on the steps of the United States Capitol Building on February 1, 1980," and that "such ceremony shall be open to the public and arranged not to interfere with the needs of Congress, under conditions to be provided by the Capitol Police Board." S.Res. 342, 96th Cong., 2d Sess., 126 Cong.Rec. 1131 (1980).

7. See, e.g., *Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 804, 104 S.Ct. 2118, 2128, 80 L.Ed.2d 772, 786 (1984) ("the First Amendment forbids the government to regulate speech in favor of some viewpoints or ideas at the expense of others"); *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212, 216 (1972) ("above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content").

8. See *Women Strike for Peace v. Morton*, 153 U.S.App.D.C. 198, 216, 472 F.2d 1273, 1291 (1972) (concurring opinion) ("governmental approval of ... ideas ... can play no role in a constitutional licensing system").

Senate's bare sponsorship reflect an intention to provide a forum exclusively for those wishing to demonstrate their allegiance to that body's policy toward the 1980 Winter Olympics.

Despite these guideposts and the significance they bear for lawyers and judges, qualified immunity remains the pivotal issue on this appeal. Of decisional importance is not what Senate Resolution 342 did or did not do, but what the involved policemen reasonably thought in that regard. The doctrine of qualified immunity rests on the inevitability that public officials performing discretionary functions will sometimes reach mistaken but reasonable conclusions, and that these must be tolerated in the interest of vigorous and effective discharge of their duties.[9] Particularly with regard to legal conclusions, lay officers obviously cannot be expected to perform at the level achievable by those trained in the law. These immutable facts easily explain why there could be a difference between the real import of the Senate's resolution and the construction the Capitol police officers placed upon it.

The relevant jurisprudence is straightforward. "[G]overnment officials performing discretionary functions[ ] generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." [10] Put another way, "whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, ... assessed in the light of the legal rules that were 'clearly established' at the time it was taken...." [11] Very importantly,

> the right the official is alleged to have violated must have been "clearly established" in a ... particularized ... sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.... [I]n the light of preexisting law the unlawfulness must be apparent.[12]

I cannot say that in the ambiguous circumstances presented here it was.

---

**9.** See *Harlow v. Fitzgerald, supra* note 1, 457 U.S. at 806, 102 S.Ct. at 2732, 73 L.Ed.2d at 403; *Nixon v. Fitzgerald,* 457 U.S. 731, 744–745, 102 S.Ct. 2690, 2698, 73 L.Ed.2d 349, 360 (1982).

**10.** *Harlow v. Fitzgerald, supra* note 1, 457 U.S. at 818, 102 S.Ct. at 2738, 73 L.Ed.2d at 410 (citations omitted).

**11.** *Anderson v. Creighton, supra* note 2, —— U.S. at ——, 107 S.Ct. at 3038, 97 L.Ed.2d at 530

(quoting *Harlow v. Fitzgerald, supra* note 1, 457 U.S. at 819, 818, 102 S.Ct. at 2739, 2738, 73 L.Ed.2d at 411, 410) (citations omitted).

**12.** *Anderson v. Creighton, supra* note 2, —— U.S. at ——, 107 S.Ct. at 3039, 97 L.Ed.2d at 531 (citations omitted).